AO 440 (Rev. 12/09) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| | |
|---|---|
| U.S. AIRLINE PILOTS ASSOCIATION, | ) |
| _Plaintiff_ | ) |
| v. | ) |
| U.S. AIRWAYS, INC., and U.S. AIRWAYS GROUP, INC., | ) |
| _Defendant_ | ) |

**CV11 -2579**

Civil Action No.  11-CIV-

## SUMMONS IN A CIVIL ACTION

ROSS, J.

To: _(Defendant's name and address)_   U.S. Airways, Inc.
111 West Rio Salado Parkway
Tempe, AZ  85281

U.S. Airways Group, Inc.
111 West Rio Salado Parkway
Tempe, AZ  85281

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:    Brian O'Dwyer, Esq.
O'Dwyer & Bernstien, LLP
52 Duane St., 5th Fl.
New York, NY  10007

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

ROBERT C. HEINEMANN

_CLERK OF COURT_

Date:  _05/27/2011_

_Signature of Clerk or Deputy Clerk_

AO 440 (Rev. 12/09)  Summons in a Civil Action (Page 2)

Civil Action No.   11-CIV-

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.


Date: _____          _____

                                                    *Server's signature*


                                   _____

                                                    *Printed name and title*


                                   _____

                                                    *Server's address*

Additional information regarding attempted service, etc:

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

CV11 - 2579

-------------------------------------------------------------------X

U.S. AIRLINE PILOTS ASSOCIATION, by its President
Michael Cleary,

FILED
IN CLERKS OFFICE
U.S. DISTRICT COURT E.D.N.Y

11-CIV- ★ MAY 27 2011 ★

Plaintiff,

-against-

ROSS, J.

BROOKLYN OFFICE

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

US AIRWAYS, INC., and US AIRWAYS
GROUP, INC.

Defendants.

-------------------------------------------------------------------X

Plaintiff U.S. AIRLINE PILOTS ASSOCIATION (hereinafter "USAPA"), by its President

Michael Cleary, and by and through its attorneys, O'DWYER & BERNSTIEN, LLP, as and for its

Complaint, respectfully alleges as follows:

## NATURE OF ACTION

1.      USAPA brings this action against defendants US AIRWAYS, INC. (hereinafter "US

Airways") and US AIRWAYS GROUP, INC. (hereinafter "US Airways Group") for declaratory

and injunctive relief pursuant to 28 U.S.C. § 2201, the Declaratory Judgment Act, and 45 U.S.C. §§

151-188, the Railway Labor Act (hereinafter "RLA").

2.      Beginning in or around September 23, 2005, and continuing to the present, the

parties have been involved in a "major" dispute within the meaning provided by the RLA and

relevant case law, namely, negotiations to amend the applicable collective bargaining agreements

pursuant to the RLA's dispute resolution process.

3.      During the aforementioned process, defendants have unilaterally altered the

objective working conditions of US Airways pilots by intentionally frustrating and abrogating the

contractual grievance and arbitration procedures outlined in the collective bargaining agreements,

and refusing to follow well established and agreed upon procedures, practices, and customs regarding disputes between the parties. The various ways by which defendants have frustrated and abrogated the above procedures, practices, and customs are set forth herein.

4.      Through their actions described above and further set forth below, defendants have violated their obligations under the RLA to maintain the status quo with respect to terms and conditions of employment for those US Airways pilots represented by USAPA. As such, USAPA is entitled to declaratory and injunctive relief.

5.      Throughout the instant "major" dispute, defendants have also violated Section 2 (First) of the RLA, 45 U.S.C. § 152 (First), by intentionally failing to "exert every reasonable effort" to reach an agreement with USAPA regarding a single integrated collective bargaining agreement. Defendants have bargained in bad faith in violation of the RLA by, *inter alia*, engaging in surface bargaining and employing evasive and dilatory tactics with respect to the ongoing "major" dispute.

6.      Defendants have further violated Section 2 (First) of the RLA, 45 U.S.C. § 152 (First), by failing to "exert every reasonable effort … to settle all disputes … arising out of the application of" the current collective bargaining agreements. Specifically, defendants have frustrated effective administration of the contractual dispute resolution procedures and established practices, which have caused contractual grievances to be unreasonably delayed and unresolved. The egregious nature of defendants' illegal conduct is furthered by the fact that important safety grievances are not being resolved as a result, thereby leading to a heightened risk of injury or death to employees and customers, and damage to interstate commerce in violation of the spirit of the RLA.

7.      In a further manifestation of the violation of the status quo, defendants have embarked upon a campaign of harassment and intimidation of pilots for raising safety concerns and

exercising their discretion to ensure the safety of employees and customers. Among other tactics, and in a sharp departure from prior practice, defendants repeatedly invoke the disciplinary processes of the collective bargaining agreements – even where discipline does not ultimately result – to interrogate pilots for raising safety concerns such as sufficient fuel, malfunctioning ventilation equipment, and lack of adequate rest between flights.

8.      In response to defendants' multiple violations of the RLA, USAPA seeks injunctive and declaratory relief as described fully *infra*, including, but not limited to, an order compelling defendants to revert to the status quo rules and working conditions and comply with its legal obligations under the RLA.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction under the RLA, 45 U.S.C. §§ 151 *et seq.*, pursuant to 28 U.S.C. § 1331. This Court also has jurisdiction herein pursuant to 28 U.S.C. § 1337, as this is an action arising under a statute that regulates commerce and/or protects trade and commerce against restraints, namely, the RLA.

10.     Plaintiff's claims are also brought under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and seek a declaration as to the parties' rights and obligations under the RLA. USAPA is entitled to such a declaration because the instant dispute is an actual and existing controversy.

11.     Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b), because jurisdiction is not dependent on diversity of citizenship and it is a district where USAPA is doing business, and defendants reside in, are found in, or are doing business in this district. It is also the district in which US Airways operates numerous flights daily from JFK and LaGuardia airports.

## PARTIES

12.     USAPA is a private, unincorporated association operating as a labor organization. USAPA is a "representative" as defined by the RLA, 45 U.S.C. § 151 (Sixth), and is the certified collective bargaining representative of US Airways pilots.  USAPA has its principal place of business located at 200 E. Woodlawn Road, Suite 250, Charlotte, North Carolina, 28217.  By its officers and employees, USAPA conducts business and acts on behalf of its members in the Eastern District of New York.  Michael Cleary is the President of USAPA and appears in his representative capacity.

13.     US Airways is a commercial airline with national and international operations, and is a "common carrier by air" within the meaning of 45 U.S.C. § 181, and as such its labor relations is governed by the RLA, 45 U.S.C. §§ 151 *et seq.*  US Airways has its principal place of business located at 111 West Rio Salado Parkway, Tempe, Arizona  85281.

14.     Upon information and belief, US Airways is a wholly owned operating subsidiary of US Airways Group.

15.     Upon information and belief, US Airways Group is an airline holding company with certain wholly owned operating subsidiaries, including, but not limited to, US Airways, and has its principal place of business located at 111 West Rio Salado Parkway, Tempe, Arizona  85281.

## FACTUAL BACKGROUND

16.     In May, 2005, US Airways and America West Airlines announced their intention to merge and become a single airline known as US Airways.

17.     At the time of the announcement, US Airways and America West Airlines were each parties to collective bargaining agreements governing the terms and conditions of employment for their respective pilots.

18.     In or about September, 2005, US Airways and American West Airlines completed their agreement to merge, and are now known as US Airways.

19.     The US Airways collective bargaining agreement (commonly and hereinafter referred to as the "East CBA") became effective on or about January 1, 1998, and amendable on or about December 31, 2009.

20.     The America West Airlines collective bargaining agreement (commonly and hereinafter referred to as the "West CBA") became effective on or about January 1, 2004, and amendable on or about December 30, 2006.

21.     On or about September 23, 2005, the parties entered into a Letter of Agreement known as the Transition Agreement, which set forth procedures for the merger of US Airways and America West Airlines.

22.     Under the terms of the Transition Agreement, although US Airways and America West Airlines are now US Airways, the pilot workforces of US Airways and America West Airlines remain separate and covered by the East CBA and West CBA, respectively, until there is a single integrated collective bargaining agreement.

23.     From the time of the merger until April, 2008, all US Airways pilots (including the former America West Airlines pilots) were represented by the Airline Pilots Association ("ALPA").

24.     In April, 2008 and continuing to the present, USAPA replaced ALPA as the certified, exclusive bargaining representative of the pilots of the now merged US Airways.

25.     As the certified, exclusive bargaining representative of the US Airways pilots, USAPA became a party to the East CBA and West CBA, and, in or around June 2008, took over negotiations for a single integrated collective bargaining agreement, which negotiations continue to date.

## FACTS

### *USAPA and Defendants are Engaged in a "Major" Dispute*

26.     Pursuant to the RLA and its major dispute resolution procedures, the parties have been engaged in negotiations over a single integrated collective bargaining agreement since on or about September 23, 2005.

27.     Pursuant to the Transition Agreement, the parties have agreed to negotiate one integrated collective bargaining agreement to replace the East CBA and West CBA.

28.     Negotiations slowly progressed between ALPA and defendants following commencement of the negotiation process, as defendants insisted upon draconian terms and ignored ALPA's proposals for industry standard wages and conditions of employment.

29.     After USAPA's certification as the new collective bargaining representative in or around April 2008, negotiations for the single integrated collective bargaining agreement continued.

30.     In or around April 2009, defendants insisted upon private mediation of the ongoing "major" dispute, over USAPA's objection on the grounds it was a delaying tactic and wholly unnecessary in light of the extensive "major" dispute resolution procedure mandated to the parties under the RLA[1].

31.     Delay serves the interests of defendants and provides a competitive advantage over defendants' competitors, in that the current collective bargaining agreements provide for lower pilot costs than most, if not all, of defendants' competitors.

---

[1] See Western Airlines, Inc. v. International Brotherhood of Teamsters, 480 U.S. 1301, 1302, 107 S.Ct. 1515 (1987) ("'Major' disputes involve the formation of collective-bargaining agreements, and the resolution of such disputes is governed by § 6 of the [Railway Labor] Act, 45 U.S.C. §§ 156, 181."); Elgin, Joliet and Eastern Railway Company v. Burley, 325 U.S. 711,723, 65 S.Ct. 1281, 1289-90 (1945) (collective bargaining negotiations constitute a "major" dispute).

32.     However, as private mediation was a right available to either party under the terms of the Transition Agreement, in or around May 2009, private mediator Carol A. Wittenberg was selected and shortly thereafter began presiding over the parties' "major" dispute.

33.     Seven months of very little, if any, meaningful private mediation confirmed USAPA's concerns regarding defendants' improper motivations for demanding private mediation, and in or around November 2009, USAPA applied to the National Mediation Board (hereinafter "NMB") for mediation services in connection with the aforementioned "major" dispute, pursuant to the RLA's "major" dispute resolution procedures.

34.     By letter dated November 16, 2009, the NMB assigned the instant "major" dispute a file number, and, in January 2010, accepted the case and assigned mediator Terri Brown ("Brown") to preside over the "major" dispute in question.

35.     From May 2010 and continuing to the present, the parties have engaged in contentious monthly collective bargaining mediation sessions under the supervision of NMB Mediator Brown.

36.     During the past thirteen months, the parties have met only three days per month with NMB Mediator Brown in an attempt to resolve the ongoing "major" dispute.

37.     On March 1, 2011, USAPA requested that the current time allotted each month for mediation be doubled.  USAPA offered to meet at NMB Mediator Brown's principal place of business, and articulated a willingness to be available for mediation on whatever dates were available.

38.     In response, defendants advised Mediator Brown they were unavailable to meet on Mondays.  Defendants amended their prior position that they were generally unavailable on Fridays to agree to meet for ½ day on Fridays.

39.     In or around May 2011, NMB Mediator Brown partially approved USAPA's request, adding an additional half-day per month to each group of mediation sessions going forward.

40.     The last group of NMB mediation sessions occurred from May 10, 2011 to May 12, 2011, inclusive.

41.     The next NMB mediation sessions are scheduled for June 21, 2011 to June 24, 2011, inclusive.

42.     Despite the past thirteen months of NMB mediation sessions, negotiations have only resulted in agreement with respect to ten out of the thirty collective bargaining sections being negotiated.   None of the agreed upon sections pertain to crucial terms or conditions of employment, including wages, benefits, scheduling and retirement; said sections being the most contentious and bitterly disputed between the parties.

43.     The parties' "major" dispute is ongoing, as the RLA's "major" dispute resolution procedures have not been exhausted.

### *Defendants' Intentional Failure to "Exert Every Reasonable Effort" to Negotiate a New Collective Bargaining Agreement*

44.     Despite the continued good faith efforts of USAPA to reach an agreement with defendants over a single integrated collective bargaining agreement governing the terms and conditions of employment for both East and West pilots, no such agreement has been reached, and no significant progress made, except with respect to a small number of minor sections of the current collective bargaining agreements.

45.     Pursuant to the current collective bargaining agreements, the pay, vacation and retirement benefits provided to pilots employed by defendants are either the lowest or among the lowest in the airline industry, thereby giving defendants a substantial advantage over their competitors with respect to pilot costs.

8

46.     Upon information and belief, defendants are refusing to exert every reasonable effort to reach an agreement with USAPA, and deliberately prolonging negotiations in order to retain their competitive advantage over other airlines.

47.     Defendants have illegally bargained in bad faith by, *inter alia*, engaging in the following acts of misconduct throughout the collective bargaining process, including private mediation and the RLA "major" dispute resolution process:  (a) expressing general hostility towards and contempt for the negotiation process; (b) delaying and frustrating bargaining by refusing to schedule additional negotiating sessions; (c) refusing to respond to proposals made by USAPA concerning major issues such as pay and vacation; and (d) intentionally and continually making unreasonable bargaining proposals while fully aware that said proposals did not conform to and were outside of existing industry standards.

### Defendants' Duty to Maintain the Status Quo during the Instant "Major" Dispute

48.     Under the terms of both the East CBA and West CBA, the parties have agreed to submit any "grievance concerning any action of the Company affecting [pilots]" to the binding grievance and arbitration procedures set forth in Sections 19 through 21 of the CBAs.  (See East CBA, Sections 19 to 21, annexed hereto as Exhibit "1"; West CBA, Sections 19 to 21, annexed hereto as Exhibit "2")

49.     USAPA, and its predecessor, ALPA, have represented pilots in any and all contractual or disciplinary disputes, and, where warranted, have proceeded to grieve and arbitrate said disputes pursuant to the binding grievance and arbitration procedures set forth in the respective CBAs.

50.     As of March 31, 2011, there are approximately 3,892 active US Airways pilots – 2,551 pilots covered by the East CBA and 1,341 pilots covered by the West CBA.

51.     The procedures for investigations and discipline of pilots and the grievance and arbitration process are set forth in Sections 19 to 21 of both the East CBA and the West CBA.  Both CBAs outline steps required to be taken before any disciplinary action can be taken against a pilot.

52.     In addition to the contractual grievance and arbitration procedures set forth in the East CBA and West CBA, the parties have agreed upon and implemented additional long-standing and well established practices and customs that have become so firmly established and customary as to become part of and integral to the grievance and arbitration process.

53.     However, beginning in Spring 2007, and continuing to the present, defendants have systematically hindered and frustrated the grievance and arbitration process in a deliberate attempt to unilaterally alter and abrogate the binding grievance and arbitration process.

54.     Defendants' scheme has resulted in a backlog of approximately 510 ongoing and unresolved grievances that must be resolved or adjudicated pursuant to the CBAs' binding grievance and arbitration procedures.

55.     For the period April 2004 through January, 2008, the East pilots and defendants resolved 77 grievances, with an average of 19 grievances resolved each year.

56.     In April 2008, when USAPA became the certified bargaining representative for the former America West Airlines pilots, there were approximately 36 unresolved grievances in the backlog concerning the pilots covered by the West CBA.  That number has now risen to approximately 69 outstanding unresolved grievances.

57.     The remaining 441 unresolved grievances concern pilots covered by the East CBA.

58.     Defendants' scheme to frustrate the contractual grievance and arbitration process has been highlighted by defendants' failure and/or refusal to continue the following long-standing customs and well established practices expressly agreed-upon by the parties.

10

Written Notice and Investigation and Hearing Prior to Docking of Pay

59.     In addition to the procedures set forth in the collective bargaining agreement pertaining to investigations and hearings, grievances pertaining to disciplinary issues pertaining to East pilots were initially investigated and heard by the pilot's immediate supervisor, the "Chief Pilot." This long established practice and custom of the Chief Pilot initially investigating and hearing pilot disciplinary issues was confirmed and expressly held to be consistent with the investigation and hearing requirements of Section 19(B) of the East CBA in an Opinion and Award, dated May 31, 2007, issued by Arbitrator Carol A. Wittenberg.

60.     Pursuant to Section 19 of the East CBA, and confirmed and clarified in the May 31, 2007 Opinion and Award, defendants are contractually obligated to provide written notice to a pilot before docking his pay.  Defendants have continually and consistently violated Section 19 and the Wittenberg Opinion and Award by routinely docking the pay of pilots without first providing the pilot written notice and the opportunity for an investigation and hearing with the Chief Pilot, and then the right to appeal to the Senior Director prior to the docking on any pay.

Accelerated Arbitration Procedures

61.     In an attempt to reduce the backlog of cases in the grievance and arbitration process, on August 11, 2002, US Airways and USAPA's predecessor ALPA, entered into a Letter of Agreement implementing Accelerated Arbitration procedures[3] to efficiently resolve minor disputes where the material facts were not in dispute.   The accelerated arbitration procedures were routinely, consistently, and successfully utilized by US Airways and ALPA until approximately 2006, at which time US Airways unilaterally refused to employ these agreed upon contractual

---

[3] The Letter of Agreement No. 90 became effective on August 11, 2002, and became incorporated into the East CBA.

procedures for any minor grievance. even if the grievance did not concern a vital issue and did not involve a factual dispute necessitating a drawn-out hearing with extensive testimony.

62.   In 2008, ALPA attempted to invoke the Accelerated Arbitration procedures.  The parties selected a neutral arbitrator to apply the procedures.  However, defendants never agreed to a date to commence hearings.  To date, defendants have agreed to schedule only one accelerated arbitration, with dates not until March, 2012 at the earliest.

Global Settlements

63.   It has been the established practice and custom since January, 1998 to enter into global settlements with respect to some minor wage, benefit, and work issues.  Global settlements efficiently and effectively resolved minor unique disputes, some of which would never arise again because of changes to the collective bargaining agreement, and were, therefore, a crucial dispute resolution practice.

64.   From 2006 to the present, however, defendants have unilaterally refused to enter into any global settlements.

65.   Upon information and belief, approximately one-half of all outstanding grievances are appropriate for resolution through global settlements or Accelerated Arbitration.

Last Chance Agreements

66.   One of the most prominent and long-standing custom of the East grievance and arbitration practice was the entering into last chance agreements with employees facing possible discharge for alleged misconduct.  The last chance agreements were utilized to efficiently resolve some termination grievances by allowing the employee to keep his job in exchange for waiving his right to avail himself of the contractual grievance and arbitration procedure should he be accused of a similar type of alleged misconduct in the future.

67.     Last chance agreements had been utilized in nearly every termination grievance since the 1950s, were universally accepted, and beneficial and essential to the effective operation of the East grievance and arbitration process.

68.     Starting in June 2006, defendants began making unilateral changes to terms of the last chance agreements.

69.     Since 2009 and continuing to the present, defendants have unilaterally refused to enter into last chance agreements except in extremely limited circumstances, thus contributing to the current backlog of grievances.

70.     Defendants' unilateral refusal to continue the above long-standing customs and well established practices has directly resulted in the current backlog of approximately 510 outstanding grievances.

Transition Agreement Binding Grievance and Arbitration Procedures

71.     Further exacerbating the backlog is the priority required to be given to grievances pursuant to the dispute resolution procedures set forth in the Transition Agreement.

72.     The Transition Agreement provides that arbitrations pursuant to its provisions will be given priority over grievances pursuant to the East CBA and West CBA grievance and arbitration procedures.

73.     Since September 23, 2005, there have been approximately thirteen grievances pursuant to the Transition Agreement.  Three of these disputes are still pending and included in the overall grievance backlog, while the remaining ten have been resolved or adjudicated by the appointed arbitrator.

74.     Prior to April 2008, only three of these cases could not be resolved and went to an arbitration hearing.  Since April 2008, there have been six grievances under the Transition Agreement and all six went through to arbitration hearings.

75.     As part of their scheme to frustrate and abrogate the contractual grievance and arbitration procedures, defendants are refusing to resolve the pending Transition Agreement arbitrations, which take precedence over the grievances pursuant to the East and West CBAs.

Staffing Issues - Defendants' Labor Relations/ Human Resources Department

76.     Further contributing to the current grievance backlog is the understaffing of defendants' Labor Relations/Human Resources Department, which is responsible for both grievance processing and negotiating a new single integrated collective bargaining agreement.

77.     Prior to 2005, US Airways had employed no less than six individuals, and, during negotiations, as many as eight individuals, responsible for East pilot contractual issues..

78.     Prior to 2005, America West had its own management staff responsible for the negotiation and grievance processing of the West CBA, consisting of approximately four employees.  During periods of contract negotiations with the former America West Airlines pilots, American West Airlines, Inc. employed the services of an outside consultant to assist.

79.     Since the Labor Relations and Human Resources departments of US Airways and America West Airlines have merged, defendants have consistently employed only five individuals with the responsibility to manage both the East CBA and West CBA.  Despite the backlog, defendants also require four of these five employees to participate in negotiating a new collective bargaining agreement, thus further frustrating and delaying the grievance and arbitration process.

Defendants' Delay Tactics at Arbitration Hearings

80.      Defendants have also frustrated the grievance and arbitration process by engaging in conduct that has resulted in inordinate delays in processing and resolving grievances.

81.      Beginning in Spring 2007, and continuing to the present, defendants have refused to promptly schedule disputes for resolution before a neutral arbitrator, despite repeated requests by USAPA to do so.

82.      Beginning in Spring 2007, and continuing to the present, defendants have failed to complete arbitration hearings within the agreed upon number of days, thereby requiring the parties to schedule multiple hearing days in order to complete a case.

83.      In light of the significant backlog of cases, the need to schedule multiple hearing days has had the additional deleterious effect of forcing other grievances to be rescheduled at later dates, and even into subsequent calendar years.

84.      Since 2007 to the present, defendants' delay tactics have caused the parties to continue approximately seven arbitration hearings until the following year, with the number of continuations increasing each year.

85.      With the amount of continuation hearings increasing each year, and the amount of time allotted for arbitration hearings remaining constant, defendants' stalling tactics have significantly increased the grievance backlog, and will continue to do so in the absence of an injunction enjoining defendants from engaging is said misconduct.

86.      Beginning in Spring 2007, and continuing to the present, defendants have refused to comply with previous settlements between the parties, previous arbitration awards, and previous awarded grievances.[4]

---

[4] By this process, a US Airways Vice-President decides a grievance and issues an award with precedential effect that is supposed to govern in the event the same dispute arises again.

87.     This tactic requires USAPA to continue to grieve and arbitrate issues that have already been decided, thereby taking substantial time that could otherwise be devoted to resolving the approximately 510 outstanding grievances.

88.     For instance, pursuant to Section 19 of the East CBA and confirmed and clarified in the May 31, 2007 Opinion and Award, defendants are contractually obligated to provide written notice to a pilot before docking his pay.  Defendants consistently disregard this binding and precedential award and dock pilots without notice, thereby requiring USAPA to grieve and arbitrate this issue in full, and deliberately wasting valuable time and resources that should be devoted to grievances concerning unresolved contractual or disciplinary disputes.

89.     Beginning in Spring 2007 and continuing to the present, defendants have deliberately delayed in reaching a remedy on cases in which an arbitration has ruled against defendants as to liability.

90.     This tactic requires the parties to meet and confer on numerous occasions, only to have to return to the arbitrator after defendants unjustifiably refuse to come to an agreement with USAPA over a proper remedy.

91.     From 2006 and continuing to the present, defendants have refused to release pilots from their flight schedule in order to attend to union business, including, but not limited to, attendance at grievance and arbitration hearings.

92.     From 2006 and continuing to the present, defendants have refused to provide transportation for USAPA members from their job location in order to attend to union business, including, but not limited to, attendance at grievance and arbitration hearings.

93.     In or around May 2006. USAPA filed a grievance in response to defendants' refusals discussed above. USAPA continues to attempt to reach a resolution with defendants, but to no avail.

94.     By employing the above described delay tactics in addition to their refusal to apply long-standing customs and well established practices to resolve grievances, defendants have unilaterally altered and abrogated the contractual grievance and arbitration procedures in violation of the RLA.

*Governing Law*

95.     The instant labor dispute is governed by the provisions of the RLA, which defines two types of disputes that may arise between covered employers and the labor organizations representing their employees.  45 U.S.C. § 151(a)(4) and (a)(5).  Disputes falling under Section 151(a)(4) ("concerning rates of pay, rules, or working conditions") have been coined by the United States Supreme Court as "major" disputes.  Elgin, Joliet and Eastern Railway Company v. Burley, 325 U.S. 711, 723, 65 S.Ct. 1282, 1289-90 (1945).  A "major" dispute is described as one concerning contract formation or the amendment of a collective bargaining agreement.  Id.  The RLA establishes  "major" dispute resolution procedures, including, but not limited to, negotiation between the parties, mediation before the NMB, and voluntary interest arbitration.  Consolidated Rail Corporation v. Railway Labor Executives' Association, 491 U.S. 299, 109 S.Ct. 2477 (1989).

96.     While parties are engaging in the RLA's "major" dispute resolution procedures, "the parties are obligated to maintain the status quo, and the employer may not implement the contested change in rates of pay, rules, or working conditions."  Id., 491 U.S. at 302-03, 109 S.Ct. at 2480.  As such, it is generally recognized that a "major" dispute arises where the parties are negotiating over a new agreement through Section 6 procedures, see id., or where the employer attempts to unilaterally

alter said agreement outside of the RLA's collective bargaining procedures. See International Longshoremen's Association, Local 158 v. Toledo Lakefront Dock Co., 1977 WL 1809, at *3 (N.D. Ohio Dec. 16, 1977)(finding a "major" dispute where employer attempted to abrogate the contractual arbitration procedure, because such an action was not a matter of contract interpretation, but an attempt to unilaterally alter the terms of the agreement).

97.     Federal District Courts have the power to enforce the duty to maintain the status quo and enjoin either party from engaging in conduct violative of that duty.  Detroit & T.S.L.R.R. v. UTU, 396 U.S. 142, 90 S.Ct. 294 (1969).  Injunctive relief may issue, even in the absence of a traditional showing of irreparable harm.  Consolidated Rail Corp., 491 U.S. at 303, 109 S.Ct. at 2480.

98.     It has previously been held that an employer's unilateral alteration of a collective bargaining agreement by refusing to properly follow the arbitration provision therein is a violation of the status quo. See Toledo Lakefront Dock Co., 1977 WL 1809 (enjoining employer from refusing to abide by the contractual arbitration procedures).  In fact, any unilateral alteration or abrogation of an existing collective bargaining agreement during a "major" dispute is a violation of the status quo under the RLA.  See, e.g., International Brotherhood of Teamsters (Airline Division) v. Texas International Airlines, Inc., 717 F.2d 157, 160-61 (5th Cir. 1983)(holding that illegality of unilaterally amending or modifying the terms of a collective bargaining agreement during a "major" dispute is an "unquestioned principle").

99.     Under Section 2 (First) of the RLA, 45 U.S.C. § 152 (First), defendants are legally required to "exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions …"

100.    The Supreme Court has held that this requirement is a legal obligation upon parties covered by the RLA that is judicially enforceable.  <u>Chicago and North Western Railway Co. v. United Transportation Union</u>, 402 U.S. 570, 91 S.Ct. 1731 (1971).

101.    As compared to the duty to bargain in good faith under the National Labor Relations Act, "Section 2 (First) [of the RLA] imposes a higher standard of negotiation efforts …" <u>Japan Air Lines Co., Ltd. v. Int'l Ass'n of Machinists and Aerospace Workers</u>, 389 F.Supp. 27, 34 (S.D.N.Y. 1975), <u>aff'd</u>, 538 F.2d 46 (2d Cir. 1976).

102.    The standard employed in determining what type of conduct constitutes such a violation is "whether the party charged with violation of its duty has merely gone through the motions of compliance with the [RLA's] required procedures without a desire to reach an agreement." <u>Id.</u>, 389 F.Supp. at 34.

103.    "Whether this standard has been met must be determined by the whole of the party's conduct at the bargaining table." <u>Id.</u>, <u>citing</u> <u>Kennedy v. Long Island Rail Road Co.</u>, 319 F.2d 366 (2d Cir. 1963), <u>cert. denied</u>, 375 U.S. 830, 84 S.Ct. 75 (1963).

104.    A party's unlawful intent not to reach an agreement can be demonstrated where the party was "[e]ngaged in the mere pretense of negotiation, [or] adopted evasive and dilatory tactics that revealed an intent to wait until the union acceded to its demands." <u>Association of Flight Attendants v. Horizon Air Industries, Inc.</u>, 976 F.2d 541, 545 (9th Cir. 1992)(internal quotations omitted).

105.    Under Section 2 (First) of the RLA, defendants also have a legal obligation to "exert every reasonable effort … to settle all disputes, whether arising out of the application of a collective bargaining agreement or otherwise." 45 U.S.C. § 152 (First).

106. Defendants are also required to consider and decide all disputes between it and its employees "with all expedition" in conference with the designated representative of its employees. 45 U.S.C. § 152 (Second).

107. Federal District Courts are empowered to enforce compliance with the above-referenced legal obligations, and, therefore, may compel resolution of disputes and grievances through available contractual procedures and established practices, and order said disputes to be heard by the applicable System Board of Adjustment.

## COUNT I

### FAILURE TO MAINTAIN
### THE STATUS QUO DURING THE ONGOING "MAJOR" DISPUTE

108. USAPA repeats and realleges the allegations in paragraphs 1-107, inclusive, as if set forth fully herein.

109. In light of the negotiations for a single integrated collective bargaining agreement detailed above, the parties in this case are currently engaged in an ongoing "major" dispute, and have been for approximately six years.

110. Defendants have violated their duty to maintain the status quo during a "major" dispute by frustrating the grievance and arbitration procedure to the extent that said provisions of the collective bargaining agreement have been unilaterally altered by defendants' conduct.

111. In addition to explicitly violating the RLA, defendants' conduct is in derogation of the policies and principles underlying the RLA, in that the "major" dispute resolution procedures were designed in order to avoid industrial strife and damage to interstate commerce. Defendants' unlawful acts have substantially increased the likelihood that major and/or minor accidents will occur, thereby potentially resulting in serious injury and/or death to employees and customers, and significantly damaging interstate commerce.

112.    Moreover, given that the scheduling and conducting of arbitration hearings requires the active participation of defendants, only the injunctive power of this Court is a sufficient remedy to defendants' misconduct.

113.    By the foregoing acts and conduct, USAPA and its members employed by US Airways will suffer irreparable harm if injunctive relief is not provided, because there is no other avenue available to resolve disputes and disciplinary issues and obtain redress for any violations of the collective bargaining agreements.

## COUNT II

### FAILURE TO MAINTAIN
### THE STATUS QUO DURING THE ONGOING "MAJOR" DISPUTE

114.    USAPA repeats and realleges the allegations in paragraphs 1-113, inclusive, as if set forth fully herein.

115.    Assuming, *arguendo*, the parties were not engaged in negotiations under Section 6 of the RLA, there would still be a duty to maintain the status quo in this case, as defendants' attempts to unilaterally alter the dispute resolution procedures in the collective bargaining agreements are violative of Section 2 (Seventh) of the RLA, and, therefore, create a "major" dispute.  See Toledo Lakefront Dock Co., 1977 WL 1809, at *3.

116.    Defendants have violated their duty to maintain the status quo during a "major" dispute by frustrating the grievance and arbitration procedure to the extent that said provisions of the collective bargaining agreement have been unilaterally altered by defendants' conduct.

117.    In addition to explicitly violating the Act, defendants' conduct is in derogation of the policies and principles underlying the RLA, in that the "major" dispute resolutions procedures were designed in order to avoid industrial strife and damage to interstate commerce.  Defendants' unlawful acts have substantially increased the likelihood that major and/or minor accidents will

occur, thereby potentially resulting in serious injury and/or death to employees and customers, and significantly damaging interstate commerce.

118.    Moreover, given that the scheduling and conducting of arbitration hearings requires the active participation of defendants, only the injunctive power of this Court is a sufficient remedy to defendants' misconduct.

119.    By the foregoing acts and conduct, USAPA and its members employed by US Airways will suffer irreparable harm if injunctive relief is not provided, because there is no other avenue available to resolve disputes and disciplinary issues and obtain redress for any violations of the collective bargaining agreements.

## COUNT III

### FAILURE TO EXERT EVERY REASONABLE EFFORT TO REACH AGREEMENT ON A NEW COLLECTIVE BARGAINING AGREEMENT

120.    USAPA repeats and realleges the allegations in paragraphs 1-119, inclusive, as if set forth fully herein.

121.    The parties are currently engaged in negotiations over a new collective bargaining agreement concerning rates of pay, rules and working conditions for the pilots employed by U.S. Airways.

122.    Pursuant to the RLA, defendants are legally required to "exert every reasonable effort to make" such an agreement.  45 U.S.C. § 152 (First).

123.    It is well settled that whether a party violates this legal obligation depends on "whether the party … has merely gone through the motions of compliance with the [RLA's] . . . procedures without a desire to reach an agreement."  Japan Air Lines Co., Ltd. v. Int'l Ass'n of Machinists and Aerospace Workers, 389 F.Supp. 27, 34 (S.D.N.Y. 1975), see also, Chicago and

22

North Western Railway Co. v. United Transportation Union, 402 U.S. 570, 91 S.Ct. 1731 (1971)(holding that 45 U.S.C. § 152 (First) imposes a legal duty upon the parties that may be enforced in Federal District Court).

124.    Defendants have engaged in the following acts and conduct in violation of their duty to exert every reasonable effort to reach an agreement with USAPA: (a) expressing general hostility towards and contempt for the negotiation process; (b) delaying and frustrating bargaining by refusing to schedule additional negotiating sessions; (c) refusing to respond to proposals made by USAPA concerning major issues such as pay and vacation; and (d) intentionally and continually making unreasonable bargaining proposals while fully aware that said proposals did not conform to and were outside of existing industry standards.

125.    By the misconduct described herein, defendants have violated their duty under the RLA to make every reasonable effort to reach an agreement with USAPA regarding the single integrated collective bargaining agreement, because such misconduct demonstrates defendants' desire not to make such an agreement.

126.    Defendants' actions throughout the negotiating process evince a clear intent not to reach agreement with USAPA, and instead to simply delay and frustrate said process.

127.    Defendants' bad faith in negotiating the single integrated collective bargaining agreement is further evidenced by the fact that reaching said agreement would result in the loss of the current advantage defendants have over their competitors due to the terms and conditions of the current collective bargaining agreements as compared to industry standards.

<u>COUNT IV</u>

**FAILURE TO EXERT EVERY REASONABLE EFFORT TO RESOLVE
DISPUTES ARISING OUT OF THE APPLICATION OF THE
EXISTING COLLECTIVE BARGAINING AGREEMENTS**

128.    USAPA repeats and realleges the allegations in paragraphs 1-127, inclusive, as if set

forth fully herein.

129.    There is currently a backlog of approximately 510 grievances between the parties, a

vast majority of which are disputes arising out of the application of the existing East and West

collective bargaining agreements.

130.    Pursuant to the RLA, defendants are legally required to "exert every reasonable

effort to … settle all disputes … arising out of the application" of an existing collective bargaining

agreement.  45 U.S.C. § 152 (First).

131.    Defendants are also required to consider and decide all disputes between it and its

employees "with all expedition" in conference with the designated representative of its

employees.  45 U.S.C. § 152 (Second).

132.    By the misconduct described herein, namely, frustrating and abrogating the

contractual dispute resolution procedures and established practices derived thereof, defendants have

violated their legal duty under the RLA to make "every reasonable effort" to settle or otherwise

resolve disputes concerning the application of the current collective bargaining agreements.

133.    USAPA has sought to settle and resolve contractual disputes arising under the

existing East and West collective bargaining agreements, but has been unsuccessful in light of

defendants' frustration and abrogation of the contractual dispute resolution procedure, and failure to

abide by established past practices and long-standing customs regarding the resolution of grievances

and disciplinary disputes.

134.    Defendants' bad faith failure to resolve these contractual disputes is exacerbated by the fact that many of the backlogged disputes concern vital safety issues.  As such, defendants' violation of their duties under the RLA has resulted in the increased possibility that employees and the general public are exposed to a serious risk of injury or death.

135.    As stated in Count I above, USAPA and its members employed by US Airways will suffer irreparable harm if defendants' frustration and abrogation of the contractual grievance and arbitration procedure, and failure to abide by established practices, is not enjoined.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment against defendants and respectfully requests the Court, as appropriate:

I.    As to Count I:

(A)    Issue injunctive relief enjoining defendants from unilaterally abrogating and altering the relevant collective bargaining agreements pending completion of the RLA's "major" dispute resolution procedures, and ordering defendants to immediately revert the terms and conditions of employment to the status quo under the existing collective bargaining agreements; and

(B)    Issue a declaratory judgment that defendants are legally required to expediently process all outstanding grievances and arbitrations brought by or relating to US Air employees represented by USAPA;

II.    As to Count II:

(A)    Issue injunctive relief enjoining defendants from unilaterally abrogating

and altering the relevant collective bargaining agreements pending completion of the RLA's "major" dispute resolution procedures, and ordering defendants to immediately revert the terms and conditions of employment to the status quo under the existing collective bargaining agreements; and

(B)    Issue a declaratory judgment that defendants are legally required to expediently process all outstanding grievances and arbitrations brought by or relating to US Air employees represented by USAPA;

III.    As to Count III:

(A)    Issue a declaratory judgment that defendants' actions during negotiations for a single integrated collective bargaining agreement constitute a failure to "exert every reasonable effort" to reach an agreement in violation of Section 2 (First), 45 U.S.C. § 152 (First);

(B)    Issue an order requiring defendants to cease and desist engaging in such unlawful conduct; and

(C)    Issue injunctive relief restraining and enjoining defendants from refusing to "exert every reasonable effort" to reach an agreement going forward.

IV.    As to Count IV:

(A)    Issue a declaratory judgment that defendants' frustration and abrogation of the contractual grievance and arbitration procedure violates their duty under Section 2 (Second) of the RLA, 45 U.S.C. § 152 (Second), to "exert every reasonable effort" to settle or otherwise resolve disputes arising out of the application of the existing collective bargaining agreements; and

(B)      Issue an order compelling defendants to:

        (1)      comply with the contractual dispute resolution procedure and all

                practices and customs derived thereof;

        (2)      convene with USAPA on an expedited basis to settle, resolve, hear

                and/or decide all grievances and disputes involving the application or

                interpretation of the existing collective bargaining agreements; and

        (3)      comply fully with its legal obligations under Section 2 (First &

                Second).

V.      As to Counts I through IV:

(A)      Award USAPA its reasonable costs and attorneys fees associated with this

        proceeding; and

(B)      Grant such other and further relief as the Court deems equitable and just.

Dated:  May 27, 2011
       New York, New York

                        Yours, etc.,

                        O'DWYER & BERNSTIEN, LLP

                By:  _____
                        BRIAN O'DWYER (BOD 9522)
                        Attorneys for Plaintiff
                        52 Duane Street, 5th Fl.
                        New York, New York 10007
                        (212) 571-7100

EXHIBT 1

# Collective Bargaining Agreement and Letters of Agreement

## between

## US Airways, Inc.

## and

## the airline pilots in its service as represented by

## US Airline Pilots Association

## January 1, 1998 to

## January 2, 2003

**SECTION 19 - INVESTIGATION AND DISCIPLINE:**

**(A)    Investigation** <u>PIT 98-07-02</u>  <u>PIT 98-08-04</u>

     1.    If a pilot is removed from flying status pending the course of an investigation, he shall receive full pay and credit during such period.

     2    Written notification shall be forwarded to the pilot at the time of removal stating the reason(s) that the pilot has been removed from flying status and the subject of the Company's investigation.

     3.    Should the Company wish to meet with a pilot in the course of any investigation, he will be advised that he has the right to have ALPA representation present.  The Company shall allow a reasonable period of time to schedule the meeting. The Company shall endeavor not to schedule the meeting during a pilot's vacation period.  Should a pilot be called in during his vacation, the vacation day(s) shall be restored and expenses incurred by the pilot to attend the meeting shall be reimbursed.

     4.    If the Company takes disciplinary action against the pilot, the Company may continue to hold the pilot out of service with pay.  If a pilot requests an investigation and hearing pursuant to <u>Section 19(B),</u> below, the disciplinary action will not take effect until the Senior Director-Flight Operations issues the decision required in accordance with <u>Section 19(B) 4</u>.

     5.    A pilot on probation shall not have the right to file a grievance regarding any disciplinary or discharge action taken by the Company.

     6.    For procedures regarding notification of removal, see <u>Section 26(R).</u>

**(B)    Hearing**

     A pilot shall not be disciplined or dismissed from the Company without notification in writing from the Company as to any such action and such pilot shall not be disciplined or dismissed without an investigation and hearing, provided that the pilot makes written request for an investigation and hearing within fourteen (14) days after receiving such written notification.

     1.    Such written request for investigation and hearing shall be addressed to the Senior Director - Flight Operations, with a copy to Vice President Flight Operations, the pilot's Regional Director – Flying, and Labor Relations.

19(B)2.
**Investigation and Discipline**
**Notification of Investigation**
**and Hearing**

1    2.    Prior to such investigation and hearing, such pilot shall be notified in
2  writing by the Company of the precise charge or charges against him.  He may,
3  however, be held out of service by the Company pending such investigation and
4  hearing.  He shall be given the necessary time not exceeding twelve (12) days in which
5  to prepare his defense and secure the presence of witnesses and shall have the right to
6  be represented by an employee of the Company of his choice or by his duly accredited
7  representative(s).
8
9    3.    a.    Such investigation and hearing shall be held by the Senior Director
10  - Flight Operations within twelve (12) days after the receipt of the pilot's written request
11  unless the pilot or the Company requests additional time to prepare for the investigation
12  and hearing as stated in Section 19(B)2, above.  In such cases, the hearing will be held
13  within twelve (12) days following expiration of such additional time requested.
14
15        b.    Should the Senior Director – Flight Operations be unavailable (or
16  the position be unstaffed), the grievant shall be entitled to select a Regional Director –
17  Flying other than the Director who issued the disciplinary action to serve as the hearing
18  officer.  The designated Director shall receive a written request for investigation and
19  hearing pursuant to (B)1 above.
20
21    4.    Within seven (7) days after the close of such investigation and hearing,
22  the Company shall announce its decision in writing and shall furnish the pilot and his
23  duly accredited representative with a copy of the decision.
24
25  **(C)    Appeal**
26
27    When a copy of such decision has been received by the pilot and such pilot is
28  dissatisfied with the Company's decision, he shall have the right to appeal to the Vice
29  President - Flight Operations, provided such appeal request is filed by the pilot in writing
30  with the Vice President - Flight Operations within seven (7) days from the date of the
31  pilot's receipt of the decision of the hearing.  A copy of the request for appeal shall be
32  sent to the Vice President - Labor Relations and to the MEC Chairman.  Such appeal
33  hearing shall be held within twelve (12) days after the receipt of the pilot's written
34  request by the Vice President - Flight Operations.
35
36    1.    Within seven (7) days after the close of such investigation and hearing,
37  the Vice President - Flight Operations shall announce his decision in writing and shall
38  furnish the pilot and his duly accredited representative(s) with a copy of the decision.
39
40    2.    Any decision made by the Company under the provisions of this Section
41  shall be final and binding unless appealed by the pilot affected within the time limit
42  prescribed herein for such appeal.
43

3.      If after the appeal provisions herein provided have been complied with, further appeal by the pilot, if made, shall be to the "US Airways, Inc. Pilots' System Board of Adjustment" as provided for in Section 21, provided such appeal is made within thirty (30) days from the date of receipt by the pilot of the decision of the Vice President - Flight Operations.  All submissions to the System Board of Adjustment shall be made in conformity with Section 21(G).

**(D)     General**

1.      If a pilot is exonerated through hearing or appeal, the pilot shall be reinstated without loss of seniority and shall be paid for such time lost in an amount which he would have ordinarily earned had he continued in service.

2.      If a pilot is exonerated through hearing or appeal, the pilot's personnel records shall be cleared of the charges.

3.      Neither the Company nor the Association shall use recording devices in any investigation and/or discipline unless prior written agreement is obtained from the other party.  When it is mutually agreed that a stenographic report is to be taken of the investigation and hearing in whole or in part, the cost will be borne equally by both parties to the dispute.  In the event it is not mutually agreed that a stenographic report of the proceedings shall be taken, any written record taken of such investigation and hearing made by either of the parties to the dispute shall be furnished to the other party to the dispute upon request, the cost of which shall be borne equally by both parties to the dispute.

4.      The time limits specified in Section 19 may be extended by mutual agreement between the Company and the Master Executive Council or its designated representative.

5.      The Company shall not place any negative report or derogatory material in a pilot's personnel file without first providing the pilot an opportunity to inspect, review, and initial the material or report.  The said pilot shall be allowed to place in the personnel file a statement of the incident.

6.      All negative reports or derogatory material will be removed from pilots' files after a period of eighteen (18) months from the date of their receipt.  However, in accordance with the Pilot Records Improvement Act, the Company shall retain documents that are covered by the Act for up to five (5) years.  Retention of such documents beyond the 18-month limitation stated above shall not entitle the Company to use any such documents in any disciplinary proceeding.

**19(D)7.**
**Investigation and Discipline**
**General - Pilot's Access to**
**Personnel File**

1    7.    A pilot who has received notification in writing from the Company,
2 pursuant to Section 19(B), that he is subject to discipline or dismissal may request access
3 to his personnel file in his domicile.  Such file, or copies thereof, will be made available
4 in the Chief Pilot's office during normal business hours, provided the pilot has notified
5 his Chief Pilot at least forty-eight (48) hours in advance of the date he wishes to review
6 his file.
7
8    8.    The transportation provisions of Section 21(Q) will apply to any investigation
9 or hearing held in accordance with the provisions of this Section.
10
11    9.    When a pilot has been on disciplinary suspension, the Company shall
12 return the pilot to pay status on the day following the completion of the suspension
13 period.  A pilot who requires training to return to active status shall attend the first
14 training class offered unless such training is scheduled to occur during a previously
15 awarded vacation period.
16
17    10.    The Company shall notify a pilot's LEC Chairman and ALPA Contract
18 Administration in writing whenever a letter of discipline is issued.
19

# PERSONAL NOTES:

# PERSONAL NOTES:

1

2

3 _____

4 _____

5 _____

6 _____

7 _____

8 _____

9 _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____

26 _____

27 _____

28 _____

29 _____

30 _____

31 _____

32 _____

33 _____

34 _____

35 _____

36 _____

37 _____

38 _____

39 _____

40 _____

41 _____

42 _____

43 _____

44 _____

45 _____

**SECTION 20 - GRIEVANCES:**

**(A)**     Any pilot, group of pilots, or the MEC Chairman (or his designee) on behalf of a pilot or group of pilots who have a grievance concerning any action of the Company affecting them shall be entitled to have such grievance handled in accordance with the procedure established in Section 19(B) 1,3,4, (C), and (D) hereof, for investigation and hearing.

**(B)**     A grievance filed by the MEC Chairman (or his designee) shall be referred directly to the Vice President - Flight Operations for initial hearing pursuant to Section 19(C) and (D).  Should further appeal be necessary, the grievance shall be processed in conformity with Section 19(C) 3.

**(C)**     Grievances must be filed within one hundred twenty (120) days after the grievant has, or reasonably would have had knowledge of the matter-giving rise to the grievance.

20
Personal Notes

# PERSONAL NOTES:

# SECTION 21 - SYSTEM BOARD OF ADJUSTMENT:

**(A)** In compliance with Section 204, Title II, of the Railway Labor Act, as amended, there is hereby established a System Board of Adjustment for the purpose of adjusting and deciding disputes which may arise under the terms of the Pilots' Agreement and any amendments or additions thereto and which are properly submitted to it, which Board shall be known as "US Airways, Inc. Pilots' System Board of Adjustment", (hereinafter referred to as the "Board").

**(B)** The Board shall consist of five (5) members in all cases unless the Company or the Association expressly requests, in the manner set forth in Paragraph (M) herein, that the appeal be heard by a Board consisting of four (4) members. In the case of the four-member Board, two (2) members shall be selected and appointed by the Association and two (2) shall be selected and appointed by the Company, and such appointees shall be known as the "Adjustment Board Members". Each party will designate its members and at all times thereafter will promptly notify the other party in writing of any change of such appointees. The five-member Board shall consist of the Adjustment Board Members and, in addition, a neutral, appointed under Paragraph (L).

**(C)** The four (4) members shall serve for one (1) year from the date of their appointment or until their successors have been duly appointed. Vacancies in the membership of the Board shall be filled in the same manner as is provided herein for the selection and appointment of the original members of the Board.

**(D)** The Board shall have jurisdiction over disputes between any employee covered by the Pilots' Agreement and the Company growing out of grievances or out of interpretation or application of any of the terms of the Pilots' Agreement. The jurisdiction of the Board shall not extend to propose changes in hours of employment, rates of compensation, or working conditions covered by existing agreements between the parties hereto.

**(E)** The Board shall consider any dispute properly submitted to it by the President of the Association or by the Vice President - Labor Relations when such dispute has not been previously settled in accordance with the terms provided for in the Pilots' Agreement.

**(F)**      Appointments of members of the Board shall be made by the respective parties within thirty (30) days from the date of the signing of this Agreement and said appointees shall meet in the City of Washington, DC within forty-five (45) days from the date of the signing of this Agreement, and shall organize and select a chairman and vice-chairman both of whom shall be members of the Board.  The terms of offices of chairman and vice-chairman shall be one (1) year.  Thereafter, the Board shall designate one of its members to act as chairman and one to act as vice-chairman for one (1) year terms.  Each officer so selected shall serve for one (1) year or until his successor has been duly selected.

The office of the chairman shall be filled and held alternately by an Association member of the Board and by a Company member of the Board.  When an Association member is chairman, a Company member shall be vice-chairman and vice versa.  The Chairman, or in his absence the vice-chairman, shall preside at meetings of the Board and at hearings and shall have a vote in connection with all actions taken by the Board.

After the organization meeting referred to herein, the Board shall thereafter meet in the city where the general offices of US Airways, Inc., are maintained (unless a different place of meeting is agreed upon by the Board) during the first full week in April and the first full week in October of each year, provided that at such time there are cases filed with the Board for consideration, and shall continue in session until all matters before it have been considered unless otherwise mutually agreed upon.

**(G)**      All disputes properly referred to the Board for consideration shall be addressed to the chairman, with a copy sent to the Vice President - Labor Relations and to the MEC Chairman.  Five (5) copies of each petition, including all papers and exhibits in connection therewith shall be forwarded to the chairman who shall promptly transmit one (1) copy thereof to each member of the Board.

**Each case submitted shall show:**

1.      Question or questions at issue;
2.      Statement of facts;
3.      Position of employee or employees;
4.      Position of Company.

When possible, joint submissions should be made, but if the parties are unable to agree upon a joint submission then either party may submit the dispute and its position to the Board.  No matter shall be considered by the Board which has not first been handled in accordance with the appeals provisions of the Pilots' Agreement, including the rendering of a decision thereon.

**(H)**    Upon receipt of notice of the submission of a dispute, the chairman shall set a date for hearing in accordance with the procedure stated in Section 21 (L). However, if at least two (2) members of the Board consider the matter of sufficient urgency and importance, then a hearing shall be held at such earlier date and at such place as the chairman and vice-chairman shall agree upon, but not more than fifteen (15) days after such request for meeting is made by at least two (2) of said members, and the chairman shall give the necessary notices in writing of such meeting to the Board members and to the parties to the dispute.

**(I)**    Employees covered by the Pilots' Agreement may be represented at Board hearings by such person or persons as they may choose and designate, and the Company may be represented by such person or persons as it may choose and designate.  Evidence may be presented either orally or in writing, or both.

On request of individual members of the Board, the Board may, by a majority vote, or shall at the request of either the Association representatives or the Company representatives thereon, summon any witnesses who are employed by the Company and who may be deemed necessary by the parties to the dispute, or by either party, or by the Board itself, or by either group of representatives constituting the Board.

The number of witnesses summoned at any one time shall not be greater than the number, which can be spared from the operation without interference with the services of the Company.

**(J)**    A majority vote of all members of the Board shall be competent to make a decision.

**(K)**    Decisions of the Board in all cases properly referable to it shall be final and binding upon the parties hereto.

**(L)**    1.    The fifth and neutral member of the System Board shall be selected by the Company and the Association from the panel attached hereto as Appendix A.  If the Company and the Association cannot agree upon the neutral member or a method for selecting him, they shall select him by alternately striking names from the panel.  The order of striking shall be determined by lot for the first case in which a neutral member is chosen under the provisions hereof and, in subsequent cases, the parties shall alternate taking the first strike.  The Chairman or his designee will immediately contact the selected neutral to determine his availability and will advise the other Board members in regard thereto and they shall agree upon a date for the hearing.  If the neutral member selected for the particular case is unable to serve within sixty (60) days after his selection, the arbitrator who was remaining on the list prior to the last strike shall be contacted as above.  Such a procedure will be followed until a panel member is selected to hear the case.  The Chairman or his designee shall supply the necessary notices of such meeting, time and place, in writing to the Board members and the parties to the dispute.

**21(L)2.**
**System Board of Adjustment**
**Panel of Neutral Arbitrators**

1       2.     The panel of neutrals, attached hereto as Appendix A, shall consist of nine
2    (9) arbitrators.  Each panel member shall serve for a minimum period of twelve (12)
3    months, effective on the date of signing of the agreement.  After a panel member has
4    served for a twelve- (12) month period, either the Company or the Association may
5    serve notice to remove him by notifying the other party.  Within thirty (30) days of such
6    notification, or if a vacancy occurs on the panel, the parties will endeavor to select a
7    replacement.  If the parties cannot agree on a replacement panel member within thirty
8    (30) days, the chairman of the Board may petition the National Mediation Board to
9    provide three (3) names of arbitrators and the Company and the Association will select,
10   under the procedures set forth in Paragraph (L) 1 above, one (1) of the three (3) arbitrators
11   as a replacement panel member.
12
13   **(M)**    Either the Association or the Company may, by written request accompanying
14   the submission or given within seven (7) days following the date on which the appeal
15   submission shall have been transmitted to the Chairman, as provided in Paragraph (G),
16   secure a hearing before the four (4) member board; in the absence of such written
17   request, the dispute shall be submitted to the five-member Board, as a constituted in
18   Paragraphs (B) and (L) herein.
19
20   **(N)**    Nothing herein shall be construed to limit, restrict or abridge the rights or
21   privileges accorded either to the employees or the employer or to their duly accredited
22   representatives under the provisions of the Railway Labor Act, as amended, and the
23   failure to decide a dispute under the procedures established herein shall not, therefore,
24   serve to foreclose any subsequent rights which such law may afford or which may be
25   established by the National Mediation Board by orders issued under such law with
26   respect to disputes which are not decided under the procedure established herein.
27
28   **(O)**    The Board shall maintain a complete record of all matters submitted to it for its
29   consideration and of all findings and decisions made by it.
30
31   **(P)**    Each of the parties hereto will assume the compensation, travel expense, and
32   other expenses of the Board members selected by it.
33
34   **(Q)**    Each of the parties hereto will assume the compensation, travel expense, and
35   other expenses of the witnesses called or summoned by it.  So far as space is available,
36   employees of the Company, who are grievants, witnesses, pilot representatives, or
37   Board Members shall receive "Company Business - Space Available" transportation
38   over the lines of the Company or the lines of other companies with which the Company
39   has exchange or reciprocal transportation agreements from any on-line station to the
40   point of hearing and return, to the extent permitted by law.  The Board will make every
41   effort to hold its hearings and investigations at points that will best serve the purpose of
42   satisfactorily concluding the work of the Board with the least amount of travel for the
43   greatest number of persons attending the proceedings.
44

1    **(R)**      The chairman and vice-chairman, acting jointly, shall have the authority to incur
2    such other expenses as in their judgment may be deemed necessary for the proper
3    conduct of the business of the Board, and such expenses shall be borne one-half (1/2)
4    by each of the parties hereto.  Board members who are employees of the Company
5    shall be granted necessary leaves of absence for the performance of their duties as
6    Board members.  So far as space is available, the Board members shall be furnished
7    free transportation over the lines of the Company, or the lines of other companies with
8    which the Company has exchange or reciprocal transportation agreements for the
9    purpose of attending meetings of the Board to the extent permitted by law.
10
11   **(S)**      It is understood and agreed that each and every Board member shall be free to
12   discharge his duty in an independent manner without fear that his individual relations
13   with the Company or with the employees may be affected in any manner by an action
14   taken by him in good faith in his capacity as a Board member.
15

EXHIBIT 2

# Contract 2004

Agreement between
America West Airlines,
Inc.
and the Pilots
in service of
America West Airlines,
Inc.
as represented by the
Air Line Pilots
Association,
International



December 2003



**SECTION 19**
**INVESTIGATION AND DISCIPLINE**

A.   DISCIPLINE AND DISCHARGE

1.   Before a Pilot is disciplined or discharged, the Pilot shall be notified in writing, as required by Subsection 19.C.7., of the specific charge(s) against the Pilot. The notification must be made with reasonable promptness after the date on which the Company had or reasonably should have had knowledge of the event or action upon which the charge(s) are based. The notice of charge(s) shall, at a minimum, state the charge(s) against the Pilot, and contain a brief description of the facts supporting the charge(s).   *(Notification of charges against pilot.)*

2.   Within ten (10) calendar days from receipt of the notice, the Pilot or the Association may ask for a hearing on the charge(s) by submitting a written request to the Vice President of Flight Operations. The Pilot shall have the right to be represented and call witnesses at such hearing in accordance with Section 18.   *(Pilot has 10 days from receipt of charges to request hearing)*

3.   A hearing shall be held by the Vice President of Flight Operations or a designee within ten (10) calendar days after receipt of the Pilot's written request.  Within ten (10) calendar days after the close of the hearing, the Vice President of Flight Operations or a designee shall issue a written decision to the Pilot.   *(Hearing held within 10 days; decision rendered within 10 days of hearing)*

4.   The Company may hold a Pilot out of service with all pay and benefits continued until the date of the Vice President of Flight Operations' or a designee's written decision.

5.   The Company and the Association may extend the time limits set forth in this Subsection 19.A. by mutual written agreement.

B.   RIGHT OF APPEAL

If the Pilot is dissatisfied with the Vice President of Flight Operations' or a designee's decision, the Pilot shall have the right of appeal in accordance with Section 21.

C.  GENERAL

*(Probationary pilots not covered)*

1.  This Section 19 shall not apply to a Pilot during the Pilot's probationary period.

2.  Except for probationary Pilots, no Pilot shall be disciplined or discharged except for just cause.

3.  If, as a result of any hearing, the charges against the Pilot are determined to be unfounded:

    a.  The Pilot shall be reinstated without loss of seniority and longevity;

    b.  Any pay and benefits lost because of the discipline shall be promptly restored to the Pilot;

    c.  Any opportunity for a change in Position based upon seniority lost because of the discipline shall promptly be restored to the Pilot subject to the Pilot's completion of applicable training;

    d.  The Pilot's personnel records shall be cleared of any reference to the charge(s); and

    e.  The Company shall treat the discipline for all purposes, including the Pilot Records Improvement Act of 1996, and in all records as having been "overturned."

4.  Time Limits

*(Pilot failure to request hearing shall result in loss of right to appeal)*

    a.  Whenever a Pilot fails to request a hearing or fails to appeal a decision within the deadlines prescribed by this Section 19, the discipline shall be imposed without further right to appeal.

*(Company failure to render a decision shall result in automatic appeal)*

    b.  The failure of a Company representative to issue a decision or hold a hearing within the deadlines prescribed by this Section 19 shall be deemed as upholding the proposed discipline and such proposed discipline shall be deemed to have been immediately and automatically appealed to the next step unless the Pilot indicates that the Pilot wishes to withdraw such appeal.

5.   Neither the Company nor the Association shall use recording devices other than stenographic records in any investigation or disciplinary hearing(s) unless prior written agreement is obtained from the other party.  When it is mutually agreed that a stenographic record is to be taken of the investigation or disciplinary hearing(s) in whole or in part, the cost shall be borne equally by both parties to the dispute.  Such stenographic records shall be taken by a certified court reporter, unless the parties agree otherwise.  In the event it is not mutually agreed that a stenographic record of an investigation or disciplinary hearing(s) shall be taken, either party may make such written record of the investigation or disciplinary hearing(s) at the party's own expense, provided that neither party may make a certified stenographic record without reasonable advance notice to the other party.

*(Only stenographic devices are allowed unless prior agreement between the parties)*

6.   Upon request, a Pilot's personnel file shall be open for inspection by the Pilot during normal office hours in the presence of a Company representative. Nothing of a derogatory nature shall be placed in a Pilot's file unless a copy is promptly provided the Pilot in accordance with this Subsection 19.C.6.   Upon receipt of such report, the Pilot shall have the option of responding by returning comments or an explanation for inclusion with the report in the Pilot's file or by challenging the truth or accuracy of the report.  If the Company determines the challenge is justified, the report shall be removed from the Pilot's file and destroyed. However, if the Company determines that the challenge is not justified, it shall notify the Pilot who may then utilize the provisions of Section 20 to appeal the decision.

*(Pilot personnel file shall be open for inspection by pilot)*

*(Nothing of a derogatory nature shall be placed in file unless a copy is provided to pilot)*

a.   At a Pilot's request, any disciplinary records or correspondence of a derogatory nature shall be removed from the Pilot's file after three (3) years from the date of issuance unless within that three (3) year period there has been an occurrence of the same or similar nature; provided, however the Company may retain only those records as are required by, and for the period prescribed by, the Pilot Records Improvement Act of 1996 or other applicable law or governmental regulation.   Such records shall not be used, disclosed or otherwise made avail-

*(Pilot may request disciplinary records be removed from personnel file after three years)*

able for any purpose other than compliance with the Act, law or regulation.

7. All notification(s) shall be made in writing via U.S. Postal Service Certified Mail, Return Receipt Requested or by an express delivery service, signature required, addressed to the last known address of the party to whom the notice is being given.

    a. Personal delivery with a signed and dated receipt may be used in lieu of Certified Mail or express delivery service. Where personal delivery is used, such delivery shall not be made at the beginning of or during a Pilot's pairing.

    b. All time limits specified in this Section 19 shall be determined by the date of first attempted delivery. If delivery is delayed by authorized absence (e.g., sick leave, vacation, out-of-domicile training), time limits shall run from the date of return from absence or actual delivery, whichever occurs first.

8. A copy of all notification(s) and/or decision(s), whichever are applicable, shall be furnished by the party sending the notice or decision to the ALPA Contract Administration Office and the MEC Chairman using the same method by which the notice was sent to the affected Pilot.

19-4

**SECTION 20**
**GRIEVANCES**

A.   INDIVIDUAL GRIEVANCES

1.   Any Pilot or group of Pilots who has a grievance concerning any action of the Company personally affecting the Pilot, excluding discharge or discipline matters subject to Section 19, shall be entitled to have the grievance handled in accordance with the procedure provided in this Section 20. *(Who can file a grievance)*

2.   At the Pilot's option, the Pilot may first attempt to resolve the grievance informally in consultation with the Chief Pilot. In such instances, the Chief Pilot shall render a decision and advise the Pilot accordingly within fourteen (14) calendar days from the date of consultation. The time limits for filing a grievance provided in Subsection 20.A.3.a. shall not be extended by attempting to informally resolve a grievance with the Chief Pilot. *(Informal resolution process)*

3.   If the matter is either not resolved to the Pilot's satisfaction within the time period provided in Subsection 20.A.2. or the Pilot opts not to informally consult with the Chief Pilot, then the Pilot may file a written grievance in accordance with the following:

   a.   A written grievance shall be filed with the Chief Pilot's Office within sixty (60) calendar days after the Pilot has, or reasonably would have had, knowledge of the matter giving rise to the grievance. The written grievance shall be filed on the applicable grievance form and, at a minimum, contain a reference to the provision(s) of the Agreement alleged to have been breached, a concise statement of the facts involved, and the remedy requested. *(Procedure and time limits for filing a grievance)*

   b.   The Company and the Association shall conduct a Chief Pilot hearing at least once each calendar month. The parties shall confer in advance of the hearing to jointly determine the date, time, and location for the hearing, as well as confirming the docket of grievances. A hearing may be postponed until the following month, or earlier, upon written mutual agreement between the Company and the Association. However, if the Company cancels such a hearing without forty-eight (48) *(Chief Pilot hearing procedures)*

20-1

hours advance notification, it shall reimburse the Association for the entire amount of flight pay loss associated with the release of the Association's Grievance Committee Chairman, or designee, scheduled to attend the hearing.

c. The grievances presented at the Chief Pilot hearing shall consist of any grievances filed on or before the 31st day of the month preceding the hearing, unless the Company and Association agree otherwise.

*(Chief Pilot shall render decision within 14 calendar days)*

d. The Chief Pilot shall forward a written decision to the affected Pilot within fourteen (14) calendar days of the hearing date in accordance with Subsection 20.D.3.

*(Appeal of Chief Pilot's decision)*

4. If the Pilot is not satisfied with the Chief Pilot's written decision issued within the time period stated in Subsection 20.A.3.d., then the Pilot or the Association may file a written appeal to the Vice President of Flight Operations. Such appeal shall be handled in accordance with the following:

*(Procedures and time limits for filing an appeal)*

a. A written appeal shall be filed with the Vice President of Flight Operations' Office within fourteen (14) calendar days of receipt of the Chief Pilot's decision. The appeal shall state precisely whether the Pilot requests a hearing before the Vice President of Flight Operations or whether the Vice President of Flight Operations should render a decision based upon the written appeal.

*(Vice President hearing procedures)*

b. The Company and the Association shall conduct a Vice President of Flight Operations hearing at least once each calendar month. The parties shall confer in advance of the hearing to jointly determine the date, time, and location for the hearing, as well as confirming the docket of grievance appeals. A hearing may be postponed until the following month, or earlier, upon written mutual agreement between the Company and the Association. However, if the Company cancels such a hearing without forty-eight (48) hours advance notification, it shall reimburse the Association for the entire amount of flight pay loss associated with the release of the Association's Grievance Committee Chair-

20-2

man, or designee, scheduled to attend the hearing.

c.   The grievance appeals presented at the Vice President of Flight Operations hearing shall consist of any appeals filed on or before the 31st day of the month preceding the hearing, unless the Company and Association agree otherwise.

d.   The Vice President of Flight Operations shall forward a written decision to the affected Pilot within ten (10) calendar days of the hearing date, if one was requested, or twenty-five (25) calendar days from receipt of the grievance appeal, if no hearing was requested. The written decision shall be forwarded in accordance with Subsection 20.D.3.

*(Vice President of Flight Operations shall render decision within 10 calendar days)*

5.   If the Vice President of Flight Operations' decision is unacceptable to the Pilot, the Association may appeal the decision pursuant to Section 21.

*(Association may appeal Vice President's decision)*

B.   GROUP GRIEVANCES

1.   The Master Executive Council (MEC) may file and appeal a group grievance under its own name in accordance with the procedures provided in Subsection 20.A.   Such grievance shall contain sufficient information to permit the Company to identify the individual Pilots covered by the grievance. A representative of the Association shall act on behalf of the Pilot(s) identified by the group grievance at the grievance hearing. The Company shall furnish copies of all group grievances, notices and decisions to the ALPA Contract Administration Office and the MEC Chairman.

*(MEC grievances)*

2.   No remedy awarded in a group grievance shall provide for monetary compensation for periods prior to sixty (60) calendar days from the date the grievance is filed or the date of the alleged violation, whichever is less.

C.   COMPANY GRIEVANCES

1.   The Company may file a grievance over any dispute involving the interpretation or application of this Agreement.

2.   All Company grievances shall be handled in the

20-3

following manner. A written grievance against the Association shall be filed with the President of the Association. The President shall render a decision within thirty (30) calendar days. If the decision of the President is not satisfactory to the Company, then the Company may appeal the President's decision to the System Board of Adjustment within thirty (30) calendar days from receipt of the President's decision in accordance with the procedure provided in Section 21.

D.   GENERAL

*(All time limits may be extended by written mutual agreement)*

1.   The time limits set forth in Subsection 20.A. may be extended in writing by mutual agreement of the Company and the Association. By written mutual agreement between the Company and the Association, any or all of the steps of this Section 20 may be bypassed.

2.   Time Limits

*(Company failure to meet timelines shall be considered automatic denial with automatic appeal)*

a.   The failure of a Company representative to issue a decision or hold a hearing within the deadlines prescribed by this Section 20 shall be deemed a denial of the grievance and such grievance shall be deemed to have been immediately and automatically appealed to the next step unless the Pilot indicates that the Pilot wishes to withdraw the appeal.

b.   Nothing in Subsection 20.D.2.a. shall be construed to relieve the Company of its obligation, as set forth in this Section 20, to provide a written decision stating its reason(s) for the denial of a grievance.

*(Notification methods)*

3.   All notification(s) shall be in writing and accomplished by U.S. Postal Service, Certified Mail, Return Receipt Requested, or by an express delivery service, signature required, addressed to the last known address of the party to whom the notice is being given.

a.   Personal delivery with a signed and dated receipt may be used in lieu of Certified Mail or an express delivery service.

b.   All time limits specified in this Section 20 shall be determined by the date of first attempted delivery. If delivery is delayed by au-

20-4

thorized absence (e.g., sick leave, vacation, out-of-domicile training), time limits shall run from the date of return from absence or actual delivery, whichever occurs first.

4.  The Company shall furnish copies of all grievances, notices and decisions to the ALPA Contract Administration Office and MEC Chairman, as applicable. The Association shall furnish a copy to the Vice President of Labor Relations, or a designee, of each grievance received after it has been assigned a grievance number by the Chief Pilot's office.

5.  Neither the Company nor the Association shall use recording devices other than stenographic reports in any grievance or appeal hearing(s) unless prior written agreement is obtained from the other party. When it is mutually agreed that a stenographic report is to be taken of the grievance or appeal hearing(s) in whole or in part, the cost shall be borne equally by both parties to the dispute. Such stenographic report shall be performed by a certified court reporter, unless the parties agree otherwise. In the event it is not mutually agreed that a stenographic report of a grievance or appeal hearing(s) shall be taken, either party may make such written record of the grievance or appeal hearing(s) at the party's own expense, provided that neither party may make a certified stenographic record without reasonable advance notice to the other party.

*(Only stenographic devices may be used during hearings unless prior written agreement received from other party)*

6.  All hearings provided for in this Section 20 shall be held at reasonable times and at the general offices of the Company, unless mutually agreed otherwise.

7.  At both the Chief Pilot and Vice President of Flight Operations hearings, each party may present witnesses and evidence in accordance with Section 18.

*(Witnesses may be present at both Chief Pilot and Vice President hearings)*

(This page intentionally  left blank.)

## SECTION 21
## SYSTEM BOARD OF ADJUSTMENT

A.  SYSTEM BOARD

1.  In compliance with Section 204, Title II, of the Railway Labor Act, as amended, there is hereby established a System Board of Adjustment, which shall be known as the "AMERICA WEST AIR-LINES PILOTS' SYSTEM BOARD OF ADJUST-MENT" (the "Board"). *(System Board scope)*

2.  The Board shall have jurisdiction over timely appeals of grievances filed by any Pilot, group of Pilots, the Association MEC or the Company growing out of the interpretation or application of any of the terms of this Agreement, which have not been resolved in accordance with Sections 19, 20 or the Grievance Mediation Letter of Agreement, as applicable.

3.  The jurisdiction of the Board shall not extend to proposed changes in hours of employment, rates of compensation or working conditions covered by existing Agreements between the parties or as subsequently executed.

B.  GRIEVANCE REVIEW BOARD

1.  Before a System Board of Adjustment or Mediation Conference hears a grievance, it shall first be submitted to the Grievance Review Board. Grievances subject to expedited arbitration shall, unless otherwise mutually agreed upon by the Company and Association, be excluded from this requirement.

2.  The Grievance Review Board shall be composed of no more than three (3) Company representatives and no more than three (3) Association representatives. The parties may mutually agree to employ the services of a facilitator/mediator to serve with the Grievance Review Board. In such instances, the parties shall equally share any fees and expenses associated with the facilitator/mediator. *(Maximum number of board members: three Company and three ALPA)*

3.  The Grievance Review Board shall meet during the third week of January, April, July and October of each calendar year for the requisite period of consecutive days necessary to consider those grievances pending at the Grievance Review Board *(Meeting dates third week of January, April July and October)*

level.  At least thirty (30) calendar days before the meeting, the parties shall confer regarding the anticipated duration and the grievances docketed for the upcoming meeting.  Nothing contained herein shall prevent the parties from mutually agreeing to convene a Grievance Review Board meeting more regularly than the quarterly meetings contemplated in this Subsection 21.B.3.

*(Meeting cancellation provision and expense reimbursements in that event)*

4.   Upon mutual agreement, the parties may change the date of the Grievance Review Board meeting or, if no grievances are pending, cancel the meeting.  If one (1) party has good cause to cancel an already scheduled meeting, that party shall advise the other party as far in advance of the meeting date as possible.  Should the Company cancel a Grievance Review Board meeting with less than forty-eight (48) hours advance notification, it shall reimburse the Association for the entire amount of flight pay loss associated with the release of the Association's Pilot representatives scheduled to attend the meeting.  The parties shall select a rescheduled Grievance Review Board meeting date within seventy-two (72) hours from receipt of the cancellation notice.  The rescheduled meeting shall occur within a period of two (2) weeks from the date of the originally scheduled and subsequently canceled Grievance Review Board meeting.

*(Grievant shall confer with Association in advance and provide remedy)*

5.   In advance of the Grievance Review Board meeting, each grievant shall confer with the Association's Grievance Committee in order to provide background information that may be useful in resolving the dispute.  The grievant shall also provide the Grievance Committee with grievance resolution parameters acceptable to the grievant.

*(Meetings informal and no formal record made; all admissible data may be used at future hearings)*

6.   Discussions before the Grievance Review Board shall be informal in nature and the rules of evidence shall not apply.  Each party may present such facts, evidence and arguments as desired, which shall not be limited to that presented during the prior stages of the grievance process.  With the exception of discussions amongst the Grievance Review Board members focusing upon grievance settlement, any evidence presented before the Grievance Review Board may be used by either party in a Mediation Conference, or in a System Board of Adjustment hearing if the evidence is otherwise admissible.  No formal record of the Grievance Review Board meeting shall be made.

21-2

7. Grievance Review Board meetings shall be conducted using the Interest Based Bargaining methodology wherein the Board members are prepared to resolve disputes, focus on the issues at hand, share information freely, and mutually attempt to reach a resolution to an existing problem.

*(Interest Based Bargaining (IBB) method to be used)*

8. The Grievance Review Board shall have the authority to resolve those disputes properly pending before it by one, or a combination of, the following options through mutual agreement:

*(Dispute resolution options)*

   a. Settlement – the Grievance Review Board maintains the right to settle a grievance filed by an individual Pilot or a group grievance filed by the MEC Chairman. All settlements shall be formally memorialized in writing before adjourning the Grievance Review Board meeting or at a mutually acceptable date thereafter, and shall be final and binding on all parties involved. Copies of written settlement decisions shall be provided to the Association in accordance with Subsection 20.D.4.

   b. Withdrawal – the Grievance Review Board shall be free to recommend the withdrawal of a grievance filed by an individual Pilot or a group grievance filed by the MEC Chairman. A grievance withdrawn in accordance with this Subsection 21.B.8.b. shall be considered withdrawn with prejudice.

   c. Postponement – in an effort to obtain additional information necessary to fairly resolve a grievance, or to confer with a grievant before settling or withdrawing a grievance, the Grievance Review Board may postpone further consideration of a grievance until the next quarterly Grievance Review Board meeting.

   d. Unresolved – All grievances not settled, withdrawn or postponed shall be handled in the following manner:

      i. Disciplinary Grievance – an unresolved disciplinary grievance may be presented to the four-member System Board of Adjustment in accordance with Subsections 19.B and 21.C.

      ii. Non-disciplinary Grievance – before the

21-3

adjournment of a Grievance Review Board meeting, the parties shall determine whether an unresolved non-disciplinary grievance will be resolved by a five-member System Board of Adjustment or through a Mediation Conference. If the five-member System Board of Adjustment is used, the parties shall follow the procedure provided in Subsection 21.D. If the Mediation Conference is used, the parties shall within ten (10) calendar days following adjournment of the Grievance Review Board meeting contact the mediator for availability and schedule the Mediation Conference for hearing as soon as practical. The Mediation Conference shall be conducted in accordance with the Grievance Mediation Letter of Agreement.

*(Grievant may be required to attend; alternate means of testimony allowed)*

9.   The Company and Association agree that under certain circumstances the presence of the grievant may be warranted at the Grievance Review Board, whether as a participant in the meeting, or as an advisor about the grievance outside the meeting. In such circumstances, a grievant may be required to attend the meeting. If the grievant is unable to attend due to vacation, training or personal emergency, discussion of the grievance shall be postponed until the next Grievance Review Board meeting, unless the parties agree to use alternative means of testimony as provided in Section 18. If the Company requires the grievant's presence, it shall release the grievant from flight or reserve duties (if such an assignment exists) and pay protect the grievant for the pairing or reserve assignment (or portions thereof) missed. A grievant shall not be compensated when required to appear on a day off.

C.   DISCIPLINARY DISPUTES

*(Maximum of 10 days to file appeal to Vice President of Flight Operations)*

1.   If dissatisfied with the Vice President of Flight Operations' or a designee's decision regarding a disciplinary dispute rendered pursuant to Subsection 19.A.3., either the Pilot or the Association may file a written appeal to the four-member Board within ten (10) calendar days from the date the Pilot receives a copy of the decision.

2.   In advance of the appeal being heard at the four-member Board, the parties agree to submit and con-

21-4

sider the matter at the next scheduled Grievance Review Board in accordance with this Section 21.

3.  If the matter cannot be resolved at the Grievance Review Board, then the four-member Board shall be convened within twenty-one (21) calendar days from the conclusion of the Grievance Review Board meeting to consider the appeal.

*(If no resolution, four-member board shall convene within 21 calendar days)*

4.  The Board shall be composed of four (4) members, two (2) of whom are selected by the Company and two (2) of whom are selected by the Association.  The parties shall notify each other of their designated Board members no later than seven (7) calendar days prior to the Board hearing.

*(Board composition)*

5.  The four-member Board shall render its decision on the appeal within fourteen (14) calendar days from the close of the Board hearing.  Should the Board fail to render a decision within this period, the Board shall be deemed to have deadlocked.

*(Board must render its decision on appeal within 14 calendar days)*

6.  In the event that the four-member Board deadlocks or is deemed to have deadlocked on an appeal, the Association may file a written appeal to the five-member Board discussed in Subsection 21.D.4. within ten (10) calendar days from the date the four-member Board deadlocks or is deemed to have deadlocked.

*(Appeal of four-member board deadlock must be filed within 10 calendar days)*

7.  The Association and the Company may by mutual written agreement bypass the Grievance Review Board or four-member System Board steps of this Subsection 21.C.

*(Mutual agreement to bypass)*

D.  NON-DISCIPLINARY DISPUTES

1.  If dissatisfied with the Vice President of Flight Operations' or a designee's decision regarding a non-disciplinary dispute rendered pursuant to Subsection 20.A.4.d., the Association may file a written appeal to the five-member Board within thirty (30) calendar days from the date of the decision.

*(Maximum of 30 days to file appeal of Vice President of Flight Operations' decision)*

2.  In advance of the appeal being heard at the five-member Board, the parties agree to submit and consider the matter at the next scheduled Grievance Review Board in accordance with this Section 21.

3.  If the matter cannot be resolved at the Grievance Review Board and the parties either determine not

*(Can appeal to five-member board)*

21-5

to utilize a Mediation Conference to resolve the matter or a subsequent Mediation Conference does not result in a settlement of the matter, then the five-member Board shall be convened to consider the appeal.

*(Five member-board composition)*

4. The Board shall be composed of five (5) members, two (2) of whom are selected by the Company, two (2) of whom are selected by the Association, and one member of the panel of neutrals established pursuant to Subsection 21.E. The parties shall notify each other of their designated Board members no later than seven (7) calendar days prior to the Board hearing.

*(Selection of neutral Board member)*

a. The parties shall select the neutral member from among the panel established pursuant to Subsection 21.E. by mutual agreement or, if unable to agree, by alternately striking names from the panel until one (1) name remains. Such selection shall occur within ten (10) calendar days following a timely appeal from the deadlocking of the four-member Board, the adjournment of the Grievance Review Board meeting, or the close of a Mediation Conference wherein a settlement could not be reached, as applicable.

b. The neutral shall be contacted within seven (7) calendar days following selection to schedule the hearing for a date as soon as practical.

E. PANEL OF NEUTRALS

1. The Company and the Association shall by mutual agreement designate nine (9) neutral persons as the panel of neutrals.

*(Timetable and provision for removal and replacement of neutral)*

2. The selected panel members shall serve until removed by either or both of the parties. Both parties may remove a neutral at any time by mutual agreement. Either party may remove a neutral, provided that the neutral has served at least one (1) year as a member of the panel and has heard and decided at least one (1) case. If a party determines to remove a neutral, that party shall provide the other party with thirty (30) calendar days' written notice of same, and the parties thereafter shall confer and by mutual agreement designate a replacement panel member. If the parties are unable to agree upon a replacement panel member before the expiration of

21-6

the thirty (30) calendar day period, either party may request that the National Mediation Board provide a list of five (5) potential members, all of whom shall be members of the National Academy of Arbitrators, and the replacement panel member shall be selected by the parties alternately striking names, the first strike to be determined by coin toss, until only one (1) name remains.

3.   Once a neutral has been selected to hear a case, a single party may not remove such neutral until the case has been heard and decided.

F.   PROCEEDINGS BEFORE THE BOARDS (EXCEPT GRIEVANCE REVIEW BOARDS)

1.   All disputes properly submitted to a Board for consideration shall be addressed to the Board members, including all papers and exhibits. The party filing the submission shall forward three (3) copies to the Company's Vice President of Labor Relations, in the event of an Association submission, or to the Association's Contract Administration Office, in the event of a Company submission. Each case submitted shall state: *(Submission content and direction)*

a.   The question(s) at issue;

b.   A statement of facts with supporting documents;

c.   The position of the submitting party; and

d.   The position of the other party.

2.   Joint submissions may be made, but if the parties are unable to agree upon a joint submission, then either party may submit the dispute and its position to the Board. Unless the parties mutually agree otherwise in writing, no matter shall be considered by the Board which has not first been handled in accordance with the provisions of Sections 19, 20 or the Grievance Mediation Letter of Agreement, as applicable. *(Joint submissions are optional)*

3.   A Pilot covered by this Agreement may be represented at Board hearings by a person(s) the Association may designate or by a person(s) the Pilot may designate, with the approval of the Association. The Company may be represented at Board hearings by a person(s) the Company may designate.

4. Evidence may be presented to the Board either orally or in writing and as provided in Subsection 18.B.3.

*(Written and/or oral evidence accepted)*

5. The Board, at the request of two (2) Board members, shall summon any witnesses employed by the Company who are deemed necessary to the dispute by either party or the Board itself.  The Company shall release all witnesses requested, provided that such request is reasonable and will not cause a disruption in service (e.g., cancellation of flight(s), use or projected use of all reserves in a Position).

6. Either party has the right to call witnesses at Board hearings in accordance with Subsection 18.B.

7. The Board shall be competent to decide disputes by majority vote.  Decisions of the Board shall be final and binding on the parties.

G. EXPEDITED ARBITRATION

1. If a dispute between the parties requires the use of expedited arbitration, either by express provision of this Agreement, or as subsequently mutually agreed upon, the parties shall follow the procedure set forth in this Subsection 21.G.

*(Written notice required for expedited arbitration)*

2. The party seeking expedited arbitration shall forward written notice to the other party of its intent to seek expedited arbitration, accompanied by a submission as provided in Subsection 21.F.1.

*(Three-member Board composition)*

3. A three-member Expedited Arbitration Board shall be established.  The Expedited Arbitration Board shall consist of one (1) member selected by the Company, one (1) member selected by the Association, and one (1) member of the panel of neutrals established pursuant to Subsection 21.E.  The parties shall notify each other of their designated Board member no later than seven (7) calendar days prior to the Expedited Arbitration Board hearing.

*(Selection of neutral Board member)*

a. The parties shall select the neutral member from among the panel established pursuant to Subsection 21.E. by mutual agreement, or if unable to agree, by alternately striking names from the panel, the first strike to be determined by coin toss, until one (1) name remains.  Such selection shall occur within

21-8

five (5) calendar days from the date of receipt of the notice provided in Subsection 21.G.2.

b.   The neutral shall be contacted within five (5) calendar days following selection to schedule the hearing for a date as soon as practical, but in no event later than ninety (90) calendar days from the date of receipt of the notice provided in Subsection 21.G.2.  Unless the parties mutually agree otherwise, if the selected neutral is not available within the ninety (90) calendar day period, then the last struck neutral shall be contacted to resolve the dispute.  This practice shall continue until such time as a neutral is selected, or if no neutral is available within the ninety (90) calendar day period, then the first available date of the neutral first contacted shall be used for the hearing date.

*(Neutral notification and selection of neutral if original is unavailable)*

4.   Either party may submit a pre-hearing brief to the Expedited Arbitration Board, provided that the brief is submitted no more than seven (7) calendar days before the hearing and no less than three (3) calendar days before the hearing, and a copy of the brief is provided to the other party on the same day.

*(Pre-hearing briefs may be submitted three to seven calendar days before the hearing)*

5.   The time period for each party to present its respective case shall be consistent with the concept of expedited arbitration.

6.   Either party may submit a closing brief to the Expedited Arbitration Board, provided that the brief is submitted no more than seven (7) calendar days after the close of the hearing, or three (3) calendar days after the transcript of the hearing is available to the parties, whichever is later, and a copy of the brief is provided to the other party on the same day.

*(Closing briefs submission deadlines)*

7.   The Expedited Arbitration Board shall render its award within thirty (30) calendar days after the close of the hearing. The Expedited Arbitration Board shall be competent to decide disputes by majority vote. Decisions of the Expedited Arbitration Board shall be final and binding on the parties.

*(Board shall render decisions within 30 calendar days)*

H.   GENERAL

1.   Except as otherwise provided herein, the Board shall meet as required in the city where the Company's general offices are maintained (unless the parties mutually agree otherwise), pro-

*(Board meeting location)*

vided that at such time there are cases filed with the Board for its consideration.  The specific date(s), time and location of the hearing shall be set by mutual agreement of the parties, or if unable to agree, then by the neutral, if applicable.

2.   The time limits specified in this Section 21 may be extended by mutual written agreement of the Company and the Association.

3.   Nothing contained herein shall be construed to limit, restrict or abridge the rights or privileges accorded to either the Pilot, the Company or their duly accredited representatives under the provisions of the Railway Labor Act, as amended.

*(Responsibility and distribution of incurred expenses)*

4.   The Company and the Association will respectively assume the compensation and expenses of the Board members selected by them and the witnesses called by them.  The expenses and reasonable compensation of the neutral, if applicable, shall be borne equally by the Company and the Association.  The Company and the Association also shall share equally other expenses necessary for the proper conduct of the business of the Board, such as fees for conference room facilities.

*(Board members are free to discharge their duties)*

5.   It is understood and agreed that each and every Board member shall be free to discharge the member's duty in an independent manner, without fear that the member's individual relations with the Company, Association or other Company employees may be affected in any manner by any action taken in good faith in the capacity of Board member.

6.   A copy of all correspondence and decisions of the Board shall be furnished to the Association's Contract Administration Office, the MEC Chairman and the Company's Vice President of Labor Relations (or designee, specified in writing to the Association).

*(Notification requirements)*

7.   All notification(s) shall be made in writing via U.S. Postal Service Certified Mail, Return Receipt Requested or by an express delivery service, signature required, addressed to the last known address of the party to whom the notice is being given.

21-10

8. All time limits specified in this Section 21 shall be determined by the date of first attempted delivery. If delivery is delayed by authorized absence (e.g., sick leave, vacation, out-of-domicile training), time limits shall run from the date of return from absence or actual delivery, whichever occurs first.

*(Time limits and delay of delivery parameters)*

(This page intentionally left blank.)

21-12