UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X
                                                        :

U.S. AIRLINES PILOTS ASSOCIATION, by its president  :      11-CV-2579 (ARR)  (SMG)
Michael Cleary,                                      :

                            Plaintiff,          :      AMENDED OPINION &
                                              :      ORDER[*]

     -against-                                :

US AIRWAYS, INC., AND U.S. AIRWAYS GROUP,    :
INC.,                                         :

                    Defendants.     X

-------------------------------------------------------------------

ROSS, United States District Judge:

       U.S. Airline Pilots Association ("plaintiff" or "USAPA") brings this action against US

Airways, Inc., and US Airways Group, Inc. ("defendants," "US Airways," or " the company"),

for declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §2201,

and the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151-88.  USAPA alleges that US Airways has

interfered with its employees' collective bargaining rights, has failed to maintain the status quo

during an ongoing "major" dispute, has not bargained in good faith to reach a new collective

bargaining agreement, and has failed to exert every reasonable effort to settle disputes between

the parties.  Defendants have filed a motion to dismiss pursuant to Federal Rules of Civil

Procedure 12(b)(1) and 12(b)(6).  For the reasons stated below, defendants' motion is granted.[1]

---

[*] The court amends the decision to correct a typographical error that was contained in the second sentence of the conclusion section of its original opinion and order (Dkt. No. 50).  No other changes have been made.
[1] The court denies plaintiff's request for oral argument, as the motion is suitable for decision on the briefs alone.

## BACKGROUND[2]

In 2005, US Airways merged with America West Airlines into a single airline known as US Airways.  Am. Compl. ¶¶ 12, 14; Decl. of Beth Holdren in Support of Mot. to Dismiss (Dkt. No. 26) ("Holdren Decl.") ¶ 4.  In conjunction with the merger, on September 23, 2005, US Airways entered into a Transition Agreement with the Airline Pilots Association ("ALPA"), the union representing the pilot workforces of both pre-merger airlines.  Am. Compl. ¶¶ 15, 19, 25; Holdren Decl. ¶ 4.  Under the terms of the Transition Agreement, the two pilot workforces would remain separate and covered by their pre-merger collective bargaining agreements ("CBAs") until a new agreement was concluded.[3]  Am. Compl. ¶ 20; Holdren Decl. ¶ 4.  The Transition Agreement obliged the parties to negotiate a single, integrated CBA applicable to both the pre-merger US Airways pilots ("East pilots") and the former American West pilots ("West pilots").  Moreover, it served as notice, pursuant to 45 U.S.C. §156 ("Section 6"), of "an intended change in agreements affecting rates of pay, rules, or working conditions."  Am. Compl. ¶ 27.

## I.   Negotiations Towards an Integrated CBA

Following the execution of the Transition Agreement, ALPA and US Airways began direct negotiations for a single CBA.  Id. ¶ 28; Holdren Decl. ¶ 4.  US Airways and ALPA engaged in more than sixty days of negotiations and reached tentative agreements "on fourteen entire sections and many components of the remaining sixteen sections of the proposed single agreement."  Holdren Decl. ¶ 8.  In 2007, US Airways made a comprehensive proposal, known

---

[2] The facts are compiled from the well-pleaded allegations in the amended complaint and from declarations and exhibits the parties have submitted as relevant to the determination of the court's jurisdiction in this case.  Any instances in which one party specifically contests the facts as presented by the other party are noted.  Pursuant to defendants' request, see US Airway, Inc.'s Request for Judicial Notice (Dkt. No. 29), the court takes judicial notice of the documents submitted from related federal actions insofar as the fact of those filings and orders are relevant to the resolution of this motion.  See Sea Tow Servs. Int'l v. Pontin, 607 F. Supp. 2d 378, 384 n.10 (E.D.N.Y. 2009).
[3] The pre-merger US Airways CBA became effective on or about January 1, 1998, and amendable on or about December 31, 2009.  The American West Airlines CBA became effective on or about January 1, 2004, and amendable on or about January 1, 1998.  Am. Compl. ¶¶ 16-17.

as the Kirby Proposal, whose proposals on pilot compensation and benefits—which remain active proposals to date—would increase US Airways' expense by more than $120 million per year.  Id. ¶¶ 8, 11.  The majority of that increase in expense would go towards bringing the salaries of East pilots in line with the higher salaries of West pilots.  Decl. of Paul DiOrio (Dkt. No. 34) ("DiOrio Decl.") ¶ 24 n.2.  Negotiations ceased in September 2007 after the East ALPA Executive Council passed a resolution to withdraw from collective bargaining negotiations.  Holdren Decl. ¶ 5.  In April 2008, USAPA replaced ALPA as the US Airways pilots' certified bargaining representative and became a party to the pre-merger CBAs.  Am. Compl. ¶ 21; Holdren Decl. ¶ 5.

In June 2008, USAPA and US Airways recommenced negotiations for an integrated CBA.  Am. Compl. ¶ 22; Holden Decl. ¶ 6.  USAPA's position, which it communicated to US Airways, was that the CBA should be representative of the contracts between other comparable carriers and their pilots in a post September 11th, non-bankruptcy era.  DiOrio Decl. ¶¶ 19-21.  In the summer and fall of 2008, USAPA reopened for negotiations eight or nine sections on which US Airways and ALPA had reached tentative agreements.  Holden Decl. ¶ 9; DiOrio Decl. ¶ 22.  US Airways also reopened approximately three such sections.  DiOrio Decl. ¶ 22.  Direct negotiations between the parties continued until April 2009, when USAPA proposed jointly applying to the National Mediation Board ("NMB") for mediation services pursuant to the RLA.  Am Compl. ¶¶ 33, 35.  During this period, the company's proposals had not significantly deviated from the content of the Kirby Proposal.  DiOrio Decl. ¶ 24.  Defendants declined mediation before the NMB and invoked their right, pursuant to the transition agreement, to seek private mediation.  Am. Compl. ¶¶ 36, 38; Holdren Decl. ¶ 6.  The parties participated in private mediation from June to December 2009 but did not reach an agreement.  Holdren Decl. ¶ 6;

3

DiOrio Decl. ¶27.  In November 2009, USAPA applied to the NMB for assistance with the ongoing contract negotiations; and, over US Airways' objections, the parties commenced mediation sessions under the supervision of the NMB in May 2010.  Am. Compl. ¶¶ 41-42; Holdren Decl. ¶ 7.

Collective bargaining sessions under the auspices of the NMB have been held monthly from May 2010 to present.  Holdren Decl. ¶ 7; Decl. of Dean Colello (Dkt. No. 33) ("Colello Decl.") ¶¶ 3-4.  During the period from May 2010 to May 2011, the sessions lasted approximately three consecutive days per month; since approximately May 2011, the parties have met three-and-one-half consecutive days per month.  Colello Decl. ¶¶ 3-4.  At some point, USAPA proposed that the monthly negotiations sessions be doubled, but the NMB responded that additional sessions were feasible only if the parties could make progress on an integrated CBA.  DiOrio Decl. ¶ 36.  Regular attendees at the bargaining sessions for US Airways are its Vice President of Labor Relations; Vice President of Flight Operations; Managing Director of Labor Relations, Flight; Senior Manager of Labor Relations, Flight; and an outside consultant.  Holdren Decl. ¶12.  The company also sometimes sends subject matter experts or other employees, as needed.  Id. ¶ 12.

Since June 2008, US Airways and USAPA have met nearly 110 times.  Id. ¶ 8.  To date, they have reached tentative agreements on eight of thirty sections of the CBA, namely:  Moving Expenses, Deadheading, Miscellaneous Flying and Transfer to Non-Flying or Supervisory Duty, Physical Exams, Investigation and Discipline, Grievances, System Board of Adjustment, and Union Security and Dues Checkoff.  Id. ¶¶ 8, 10.  However, according to USAPA, little progress has been reached on "crucial issues such as pilot costs and scheduling."  Am. Compl. ¶ 34.  The parties agree that the negotiations are not progressing satisfactorily.  Id. ¶ 9; Am. Compl. ¶ 34.

However, they differ in their explanations for why negotiations have not been more productive.

Plaintiff alleges that defendants are not bargaining in good faith towards an integrated CBA.  Am. Compl. ¶¶ 48-50; see DiOrio Decl. ¶ 37.  According to USAPA negotiator Paul DiOrio, US Airways has repeatedly made bargaining proposals that did not comport with comparable post-September 11th, non-bankruptcy era contracts "despite full awareness that USAPA would not accept those proposals;" has adopted a staffing methodology that substantially differs from that actually employed "to significantly overinflate the cost associated with USAPA's proposals;" and has consistently failed to respond to USAPA's proposals other than by reasserting their original position, saying no, or raising new objections.  DiOrio Decl. ¶¶ 37-40.  DiOrio states that, from July to December 2011, the company made very few or no proposals at each month's bargaining sessions.  Supp. Decl. of Paul DiOrio (Dkt. No. 48) ("DiOrio Supp. Decl.") ¶ 24.

USAPA points to a July 2011 email by a member of the US Airways negotiation team as evidence of the company's goal of delaying and frustrating the collective bargaining process. Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Dismiss (Dkt. No. 30) ("Pl.'s Mem.") at 26.  In the course of the parties' bargaining, "event data"[4] has been a significant issue because it affects staffing.  Supp. Decl. of Beth Holdren in Support of Mot. to Dismiss (Dkt. No. 41) ("Holdren Supp. Decl.") ¶ 6; DiOrio Supp. Decl. ¶¶4-5.  The parties submitted their respective event data and analysis at sessions held in March, April, and June 2011, but they were unable to come to an agreement regarding the significance of the data.  DiOrio Supp. Decl. ¶6.  On July 10, 2011, before that month's negotiation sessions began, Beth Holdren, the Managing Director of Labor Relations, Flight, sent an email to the company's negotiating team.  The email forwarded event

---

[4] Event data involves the number of days per month that check airmen are scheduled to work in their training capacity.  Check airmen are pilots responsible for training and testing other pilots.  Holdren Supp. Decl. ¶ 6.

data analysis received from Paul DiOrio and included the following comments:

> Attached is USAPA's event data they plan to present during this next session.
>
> As you'll recall, on our prep call I was not pleased that Paul decided to go back to analyzing the number of events.  I'm not sure we want to engage in any response to them but in any case, this will kill a bit of time in the next session.

Colello Decl., Ex. 1.  USAPA characterizes this last sentence as demonstrative of the company's delay tactics and evidence of its unlawful intent not to bargain for a new CBA.  DiOrio Suppl. Decl. ¶¶ 3, 5-7, 18.

US Airways disputes USAPA's characterization of the email.  According to Holdren, the parties had agreed to put aside the event data analysis and return to traditional bargaining on the issue.  Holdren Suppl. Decl. ¶¶ 7-8.  Holdren explains the email as expressing her "frustration with DiOrio's insistence on again discussing event data analysis in violation of the parties' agreement."  Id. ¶ 9.  Holdren avers that her statement about "kill[ing] a bit of time" refers to the fact that US Airways believed that there were too few topics on the agenda to fill the time scheduled and had, unsuccessfully, sought to shorten it.  Id. ¶ 9.  In a responsive declaration, DiOrio states that the parties had not agreed not to discuss event data and states that US Airways had not suggested that the bargaining session be shortened.  DiOrio Suppl. Decl. ¶¶ 3, 5-7, 18.

Offering its own view of why negotiations have not progressed satisfactorily, U.S. Airways asserts that "[b]argaining has been complicated by the fact that USAPA and the class of US Airways pilots have been embroiled in an intra-union dispute—and civil litigation— regarding a single integrated seniority list."  Holdren Decl. ¶ 12.  After the merger, a dispute arose between the East and West pilots as to their relative placement on an integrated seniority list.[5]  The dispute was submitted to arbitration before George Nicolau, who issued an award in

---

[5] The Transition Agreement set out the parties' agreement and the criteria governing the integration of the seniority lists of East and West pilots.  Id., Ex. 1A at § IV.

May 2007.   Decl. of China R. Rosas in Support of Mot. to Dismiss (Dkt. No. 28) ("Rosas Decl.") Ex. 1 ¶¶ 7-8.   However, the award was not implemented and, instead, became the subject of multi-year litigation between the West pilots and USAPA, whom the West pilots claimed had breached its duty of fair representation by attempting to rescind the award.  Id. ¶¶ 9-10; see Addington v. US Airline Pilots Ass'n, 606 F.3d 1174 (9th Cir. 2010); Addington v. US Airline Pilots Ass'n, No. CV 08-1633, 2009 U.S. Dist. LEXIS 61724 (D. Ariz. July 17, 2009).   That litigation ended with the Ninth Circuit's determination that the West pilots' action was not yet ripe, Addington, 606 F.3d at 1184, but US Airways has since filed a declaratory judgment action against USAPA and the class of West pilots seeking a judicial determination of the parties' rights with regard to the seniority dispute.  Rosas Decl. Ex. 1 ¶ 15; US Airways, Inc. v. Addington, No. 2:10-cv-01570-ROS (D. Ariz).  Filed in July 2010, that case is still pending.

US Airways represents that it will be impossible to finalize and implement a single CBA until the seniority list issue is resolved.  Holdren Decl. ¶ 12.  In support of this contention, it offers a November 2011 communication from the USAPA president to USAPA's membership.  The communication accuses US Airways of using the lack of an agreed-upon seniority system as an excuse to delay negotiations but states that "[n]o one can realistically believe that we can either reach agreement with the Company on a new contract or persuade the NMB to give us a release unless we find a solution to the seniority issue that has the general support of all our pilots."  Supp. Decl. of Lyle Hogg in Support of Mot. to Dismiss (Dkt. No. 40), Ex. 7.

## III.   Pilot Grievances and Dispute Resolution Procedures

As mandated by the RLA, both of the pre-merger CBAs contain provisions requiring arbitration before the applicable System Adjustment Board of any grievance concerning pilots.  Am. Compl. ¶¶ 29, 59, Exs. 1-2 §§ 19-21.  Under both CBAs, USAPA, US Airways, a pilot, or a

group of pilots can invoke the binding grievance and arbitration process by completing a grievance request form.  Decl. of Tracy L. Parrella (Dkt. No. 36) ("Parrella Decl.") ¶ 16. Through Letters of Agreement and custom, the parties have also established additional, alternative dispute resolution procedures that are sometimes used in lieu of arbitration.  Am. Compl. ¶¶ 58, 60.  In the Transition Agreement, the parties also agreed to use "to the maximum extent possible, expedited dispute resolution processes" to resolve open grievances and disputes. Id. ¶ 58, Ex. 3.  USAPA claims that, since approximately the spring of 2007, US Airways has been dilatory in scheduling and completing arbitrations, has unilaterally refused to employ past practices to resolve grievances, and has abandoned its agreement to use expedited dispute resolution processes.  US Airways denies these allegations and asserts that, to the extent that the pilot grievance backlog has grown in recent years, USAPA is as much to blame as US Airways.

      A.    <u>The Pilot Grievance Backlog and Attempts to Resolve It</u>

There exists—and has historically existed—a significant backlog of unresolved pilot grievances.  In 2002, the backlog of East pilot grievances was approximately 250, and active grievances remained at about 275-300 between 1998 and 2007.  Parrella Decl. ¶¶ 27, 37.  In April 2008, when USAPA became the representative for US Airways pilots and a year after US Airways is alleged to have stopped properly handling grievances, there were a cumulative total of 447 unresolved East pilot grievances.  Id. ¶¶ 41, 66; Holdren Supp. Decl. ¶ 10.  At that time, there were also approximately 36 West pilot grievances, for a total of 483 overall grievances. Parrella Decl. ¶ 66.  For the East pilots, 110 grievances were filed in 2008, 72 were filed in 2009, 43 were filed in 2010, and 9 were filed in the first five months of five months of 2011.  Parrella Decl. ¶ 5.  From April 2008 to June 2011, 111 grievances were filed pertaining to the West pilots, 84 of which were resolved prior to arbitration.  Id. ¶ 58.  At the time plaintiff filed its

amended complaint in July 2011, there were approximately 510 outstanding grievances for both East and West pilots.  Am. Compl. ¶82.  By November 2011, the number of backlogged grievances had increased to approximately 624.  Parrella Decl. ¶ 12.

In roughly October 2008, US Airways and USAPA exchanged proposals regarding how the backlog of grievances might be resolved in an expedited or abbreviated fashion.  Holdren Supp. Decl. ¶ 12.  Tracy Parrella, a member of USAPA's negotiating team, stated her belief that at least 100 of the backlogged grievances promptly could be withdrawn as moot or meritless but that she would need to review all open matters.  Id. ¶¶ 13-14.  Additionally, in October 2008, US Airways presented USAPA with a proposed letter of agreement outlining a process to resolve certain mutually-agreed upon backlogged grievances, but USAPA declined the offer.  Id. ¶ 15.  In August 2010, the grievance backlog was raised at mediation.  Id. ¶ 19.  USAPA communicated that it was planning to withdraw seventy grievances but first had to inform the pilots and indicated that it still had at least 200 grievances to review.  Id.  In September 2010, USAPA informed U.S. Airways that it would provide a list of grievances it intended to arbitrate.  Id. ¶ 20.  USAPA has not followed up with US Airways on these issues.  Id.  According to US Airways negotiator Beth Holdren, Tracy Parrella has "expressly acknowledged in her capacity as USAPA's Grievance Chairperson that the backlog was a 'mutual problem,' arising because ALPA's negotiating committee had long prioritized negotiations for a single collective bargaining agreement over resolving outstanding grievances."  Id. ¶ 11.[6]

The Transition Agreement contains a dispute resolution process that allows either party to submit a dispute regarding the agreement's interpretation or application and provides for

---

[6] The evidence in this paragraph of the parties' failed attempts to resolve the grievance backlog was submitted by defendants in a declaration accompanying their reply brief.  Plaintiff requested, and was granted, leave to file a sur-reply to respond to additional facts submitted with defendants' reply but did not comment on or respond to the evidence relating to the pilot grievance backlog.

expedited arbitration if the dispute cannot be resolved informally. Id. ¶ 3; Holdren Decl., Ex. 1A. As of November 2011, the parties and ALPA had submitted fourteen disputes under the Transition Agreements, all of which were resolved.   Holdren Supp. Decl. ¶ 3. USAA has not filed a grievance pursuant to the Transition Agreement or either CBA complaining of US Airways' failure to use expedited arbitration procedures.  Id. ¶ 23.

      B.      <u>Alternative and Expedited Dispute Resolution Processes</u>

          1.      <u>Accelerated Arbitration Procedures for East Pilot Grievances</u>

In August 2002, the pre-merger US Airways and ALPA entered into the East Accelerated Arbitration Letter of Agreement, applicable to East Pilots.  Holdren Decl. ¶ 18, Ex. 5.  That letter of agreement established a streamlined hearing procedure that allows parties to resolve grievances during a single arbitration if they mutually agree to undertake "accelerated arbitration."  Holdren Decl. ¶¶ 19-20, Ex. 5.  It is a process better suited to less complex grievances and minor disputes.  Id. ¶ 19; Parrella Decl. ¶ 28.  According to USAPA, prior to 2007, it was customary for the parties to conduct annual accelerated arbitration hearings, at which the parties would resolve between nine and twelve grievances during two days of accelerated arbitration hearings.  Parrella Decl. ¶¶ 30, 33.  Such hearings resolved 35 grievances from 2002 to 2006.  Parrella Decl. ¶ 30.  No accelerated arbitration hearings have occurred since 2006, but one is scheduled for March 2012.  Holdren Decl. ¶ 20.  This accelerated arbitration hearing is the only such hearing that USAPA or ALPA has requested since 2006.  Id. ¶ 20.

          2.      <u>Grievance and Mediation Procedures for West Pilots</u>

In 2003, America West and ALPA entered into a Letter of Agreement establishing a voluntary mediation program that may be used "by mutual agreement of the Company and the Association."  Id. ¶ 21, Ex. 6.  According to US Airways, since 2004, USAPA has made only

one request, in 2008, for mediation pursuant to this letter of agreement.  US Airways advised

USAPA that it did not believe the grievance at issue could be resolved through mediation, and

USAPA agreed to hold the grievance in abeyance until a related grievance was decided.  Id. ¶ 21.

Without detail, USAPA claims that it requested mediation on "several [other] grievances" that

the company refused to mediate, a charge that US Airways denies.  Parrella Decl. ¶ 64; Holdren

Supp. Decl. ¶ 35.  In 2007, America West and ALPA entered into a separate Letter of Agreement

establishing a streamlined mediation and arbitration procedure.  Holdren Decl. ¶ 22.  One

hearing was scheduled pursuant to this agreement, but pre-hearing discussions resulted in a

global settlement that resolved the eight grievances at issue.  Id. ¶ 22, Ex. 8.

>           3.     Global Settlements

The parties have customarily used global settlements as a means of resolving multiple

relatively simple, unique grievances at one time.  Id. ¶ 24; Parrella Decl. ¶¶ 44, 45.

USAPA avers, without detail, that many of the outstanding grievances would be amenable to

global settlement, which it claims has been abandoned since the spring of 2007.  Parrella Decl. ¶

46.  USAPA made its last proposal for a global settlement of East pilot grievances in 2006, and

defendants have not since declined a request by USAPA to engage in global settlement

discussions.  Holdren Decl. ¶ 25.

>           4.     Last Chance Agreements

The parties have also customarily used Last Chance Agreements ("LCAs") as a

mechanism to allow pilots charged with a terminable offense to keep their jobs.  US Airways

decides whether to offer LCAs on a case-by-case basis.  Id. ¶ 26.  Since March 2008, US

Airways has terminated thirteen pilots for offenses that USAPA claims were similar to ones for

which LCAs were historically offered.  Parrella Decl. ¶ 53.  US Airways executed LCAs with

four of the terminated pilots, and the parties were negotiating with a fifth in November 2011.
Holdren Decl. ¶ 26.  The nine remaining pilots, who were not offered LCAs and for whom
USAPA has filed grievances, include a pilot who surreptitiously took lewd photographs of a
teenager at an airport, a pilot who was intoxicated boarding his flight and fell down in front of
passengers, a pilot who discharged a firearm in the cockpit of an aircraft in mid-descent as a
result of disregarding standard operating procedures, and two pilots who failed timely to
complete required distance learning training.  Id. ¶ 27; Holdren Supp. Decl. ¶ 31.  Prior to 2008,
US Airways had declined to offer LCAs to pilots who, were caught, inter alia, using illegal drugs
or entertaining an unauthorized guest during a flight.  Holdren Supp. Decl. ¶ 32.

     C.     Arbitration Scheduling and Hearings

USAPA asserts that US Airways has employed improper delay tactics in the conduct of
arbitrations that have facilitated the increased buildup of grievances.  In this regard, USAPA
claims that US Airways has, inter alia, unreasonably refused to resolve minor disputes prior to
the filing of formal grievances, has delayed the process of choosing arbitrators, has failed to
cooperate with USAPA in scheduling arbitrations, and has extended arbitrations beyond agreed-
upon dates or rescheduled them at the last minute due to conflicts.  See Parrella Decl. 68-85; see
also Decl. of Laura H. Backus ¶¶ 4-7.  There is evidence that both parties, on occasion, caused
some delay to the arbitration process by failing to respond immediately to email requests from
the other party or by requesting that an arbitration hearing be rescheduled or adjourned early.
See, e.g., Parrella Decl. 75-78, Exs. 1-4; Holdren Decl. 15, Exs. 1-2.  However, USAPA has
provided few factual details about and has offered little evidence of US Airways' delay tactics
beyond sworn statements that US Airways generally engaged in such policies of delay.

**III.**     **Recent Developments**

A.      Alleged Interference with Pilots' Collective Bargaining Rights

Plaintiff filed its initial complaint on May 27, 2011.  On July 18, 2011, plaintiff amended its complaint to add new allegations that defendants had "embarked upon a campaign of harassment, intimidation, and coercion of USAPA, its leadership, vocal supporters, and pilots for exercising their rights under the RLA to engage in speech and other lawful activities for their mutual aid and benefit, to improve working conditions, . . . and to demonstrate support for their labor organization."  Am. Compl. ¶ 2.  USAPA alleges that, from April to July 2011,[7] US Airways interfered with pilots' collective bargaining rights and attempted to undermine support for USAPA by, inter alia, (1) improperly threatening to discipline pilots, (2) changing its lanyard policy, (3) conducting investigatory interviews of pilots, and (4) improperly discharging pilots.

1.      Threatened Discipline and Mistreatment of Pilots

In April and May of 2011, Captain Tom Kubik, the U.S. Airways pilot then serving as USAPA Safety Committee Chairman, published information to USAPA pilots to inform them of various measures intended to improve their working conditions and to advance the safe operation of aircraft.  Id. ¶¶ 106-08.  The communications were allegedly sent, in part, in response to the results of a Safety Culture Survey undertaken by USAPA.  Id. ¶ 108-09.  In a letter dated July 1, 2011, defendants threatened Captain Kubik with discipline for sending the communications.  Id. ¶¶ 114.  The letter listed instances in which advice given by Captain Kubik contradicted the company's standard operating procedures and warned that "[a]ny further instances in which [he] usurp[ed] management authority by issuing operating guidance without prior Company approval may result in discipline up to and including termination."  Decl. of Michael J. Cleary (Dkt. No. 32) ("Cleary Decl."), Ex. 2.  USAPA claims that these threats "became known" to its

---

[7] Although plaintiff's complaint generally alleges that defendants' campaign of union harassment began in April 2008, plaintiff fails to allege specific facts concerning any event that occurred before April 2011.

membership and were intended to interfere with support for USAPA.  Id. ¶¶ 115-16.

        2.      Change in Lanyard Policy

In April 2011, USAPA distributed to its members identification-holding lanyards bearing

the legend "Safety First, I'm on board."  In July 2011, departing from its prior policy of

permitting employees to wear a wide variety of lanyards, defendants announced that,

commencing August 1, 2011, only company-approved and uniform identification holders would

be permitted.  The company allegedly cited, as its reason for making this change, a lack of

professionalism and concern about divisiveness among the workforce because identification

holders were being used to promote organizational agendas.  Plaintiff alleges that the policy

change was instituted to censure expressions of support for USAPA and to coerce US Airways

employees from engaging in protected activity.  Id. ¶¶ 117-26.

        3.      Investigatory Interviews of Pilots

Plaintiff alleges that defendants have improperly subjected pilots to investigatory

interviews with increasing frequency and with respect to matters that were not previously the

subject of such interviews.  Defendants have required pilots to attend investigatory interviews

related to operational decision-making, including pilots' judgments concerning safe taxiing

speeds, and for addressing equipment malfunctions.  In July 2011, defendants issued notices to

thirty-five pilots for interviews on such matters.  In a departure from past practice, defendants

have also allegedly brought in pilots for issues related to fuel management.  Cleary Decl. at ¶¶

11-12.  Plaintiff argues that this conduct is "part and parcel of defendants' campaign to punish

and retaliate against pilots for supporting USAPA."  Am. Compl. ¶¶ 127-33.

        4.      Pilot Discharges

In June and July 2011, US Airways terminated pilots for failing to complete required

distance learning by the May 31, 2011 deadline.  Plaintiff alleges that the pilots were unable to complete the program for scheduling and other reasons and that US Airways' discharge of the pilots represented "a sharp departure from its usual and customary policies and practices" and was intended to punish USAPA pilots for their support of USAPA.  Am. Compl. ¶¶ 134-39.


       B.       Litigation Over the "Slowdown Campaign"

On July 27, 2011, shortly after USAPA amended its complaint in this action, US Airways filed a complaint for injunctive relief against USAPA in the federal district court for the Western District of North Carolina.  The complaint alleged that, in violation of the status quo provisions of the RLA, USAPA was encouraging its members to engage in a "campaign to cause nationwide flight delays and cancellations in order to put pressure on US Airways in its current collective bargaining negotiations with USAPA."  Complaint, US Airways, Inc. v. US Airline Pilots Ass'n, No. 3:11-cv-371-RJC-DCK (W.D.N.C. July 27, 2011) (Dkt. No. 29, Ex. 2), ¶¶ 1-2. It claimed that USAPA's "slowdown" involved, inter alia, reducing the speed at which pilots taxied aircraft, refusing to fly aircraft with minor maintenance issues unrelated to airworthiness, and failing to complete required training.  Id. ¶3.  It further alleged that USAPA was encouraging pilots to engage in such behavior under the "guise of 'safety.'"  Id.

Simultaneously with the filing of its complaint, US Airways moved for a preliminary injunction to prevent USAPA and its members from continuing to engage in the slowdown. Following the taking of evidence and two days of hearings,[8] the district court granted the motion for a preliminary injunction on September 28, 2011.  US Airways, Inc. v. US Airline Pilots Ass'n, No. 3:11-cv-371-RJC-DCK, 2011 U.S. Dist. LEXIS 111138 (W.D.N.C. Sept. 28, 2011).

---

[8] Both parties have submitted, in conjunction with this motion, the declarations they filed in relation to the preliminary judgment motion.

The court held that USAPA had "expressly tied the success of their 'fight' for a new contract to actions by their member pilots that would slow down the airline but could be cloaked by the safety campaign," id. at *9-10, and had "instigated a slowdown among East pilots that ha[d] negatively impacted the Company's operational performance." Id. at *22.  The court also specifically found that USAPA used lanyards with the term "Safety First" as a symbol of solidarity against management, id. at *18, and that the USAPA pilots' delay in completing training was "part of a concerted effort to disrupt the airline," id. at *40.  On the basis of these and other findings, the court issued an order enjoining USAPA and its members from instigating or participating in a slowdown or other concerted activity in violation of the RLA.  Id. at *72-74. On January 11, 2012, pursuant to a stipulation by the parties, the district court ordered that the preliminary injunction be converted into a permanent one.  Order, US Airways, Inc. v. US Airline Pilots Ass'n, No. 3:11-cv-371-RJC-DCK (W.D.N.C. Jan. 11, 2012) (Dkt. No. 41-1).

## DISCUSSION

Defendants seek to have dismissed the entirety of USAPA's amended complaint for lack of subject matter jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)"), and/or for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)").  As explained below, the court concludes that plaintiff has not adequately alleged a claim for failure to bargain in good faith and has not made a sufficient showing of the court's jurisdiction with respect to any of its other claims.  Defendants' motion to dismiss is therefore granted.

## I.      Standard of Review

Under Rule 12(b)(6), the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  Erickson v. Pardus, 551 U.S. 89, 94

(2007) (per curiam); Freedom Holdings, Inc. v. Spitzer, 363 F.3d 149, 151 (2d Cir. 2004).  The

complaint's allegations, however, "must be enough to raise a right to relief above the speculative

level."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  Only a "plausible claim for relief

survives a motion to dismiss."  LaFaro v. New York Cardiothoracic Group, PLLC, 570 F.3d 471,

476 (2d Cir. 2009).  "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2d Cir. 2009).  However, courts are "not

bound to accept as true a legal conclusion couched as a factual allegation," and "[t]hreadbare

recitals of the elements of a cause of action, supported by mere conclusory statements, do not

suffice."  Id. at 1949-50 (citation and internal quotation marks omitted).

 The plaintiff has the burden of proving by a preponderance of the evidence that subject

matter jurisdiction exists.  Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).  A

motion to dismiss for lack of subject matter jurisdiction may "raise a facial challenge based on

the pleadings, or a factual challenge based on extrinsic evidence."  Guadagno v. Wallack Ader

Levithan Assoc., 932 F. Supp. 94, 95 (S.D.N.Y. 1996).  Where the defendant challenges the legal

sufficiency of a complaint's allegations, the court must treat all factual allegations as true and

draw reasonable inferences in favor of the complaining party.  Robinson v. Gov't of Malay., 269

F.3d 133, 140 (2d Cir. 2001).  However, where the jurisdictional challenge is fact-based, "no

presumptive truthfulness attaches to the complaint's jurisdictional allegations," and "the burden

is on the plaintiff to satisfy the Court, as fact-finder, of the jurisdictional facts."  Guadagno, 932

F. Supp. at 95.  In assessing whether it may properly exercise jurisdiction, the court may consider

affidavits or conduct further proceedings it finds appropriate.  Id.; see Robinson, 269 F.3d at 140

("[W]here evidence relevant to the jurisdictional question is before the court, 'the district court . .

. may refer to [that] evidence.'" (quoting <u>Makarova</u>, 201 F.3d at 113)).

## II.     <u>Count IV Fails to State a Claim Upon Which Relief Can be Granted</u>

### A.     <u>The Obligation to "Exert Every Reasonable Effort" to Make Agreements</u>

"The heart of the Railway Labor Act is the duty, imposed by [45 U.S.C. § 152 First] upon management and labor, 'to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes . . . in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.'" <u>Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.</u>, 394 U.S. 369, 377-78 (1969). The duty is enforceable by the courts through declaratory and injunctive relief. <u>Chicago & N. W. Ry. Co. v. United Transp. Union</u>, 402 U.S. 570, 575 (1971). Although "[t]he 'reasonable effort' required by [45 U.S.C. § 152 First] has uncertain contours," <u>Nw. Airlines Corp. v. Ass'n of Flight Attendants-CWA (In re Nw. Airlines Corp.)</u>, 483 F.3d 160, 175 (2d Cir. 2007), where a union calls into question an employer's behavior, the duty has been treated as one to bargain in good faith, or, stated alternatively, to refrain from bad faith negotiating. <u>See id.</u> at 175-76. "[This] duty of management to bargain in good faith is essentially a corollary of its duty to recognize the union," as the bargaining status of a union can be destroyed by a company's bad faith bargaining. <u>Chicago & N. W. Ry. Co.</u>, 402 U.S. at 575 (citations and internal quotation marks omitted).

The duty imposed by 45 U.S.C. § 152 "'does not undertake to compel agreement between the employer and employees.'" <u>In re Nw. Airlines Corp.</u>, 483 F.3d at 198 (quoting <u>Virginian Ry. Co. v. System Fed'n No. 40</u>, 300 U.S. 515, 548 (1937)). Instead, in determining whether an employer has met its obligation "to exert every reasonable effort," courts examine whether the employer's conduct shows that the employer is merely going through the motions of meeting and

conferring with a "desire not to reach an agreement."  Chicago & N. W. Ry. Co., 402 U.S. at

578-79 & n.11; Japan Air Lines Co. v. Int'l Ass'n of Machinists & Aerospace Workers, 389 F.

Supp. 27, 34 (S.D.N.Y. 1975).  Examples of actions that violate an employer's duty to bargain in

good faith include refusing to meet with union representatives, to accede to a union's request for

NMB assistance, or to disclose relevant data to unions during negotiations.  In re Nw. Airlines

Corp., 483 F.3d at 176-77.  Employers also fail to exert every reasonable effort to reach an

agreement where they display hostility towards and seek to frustrate the bargaining process or

they otherwise engage in conduct clearly showing a wish to defeat agreement.  See Ass'n of

Flight Attendants, AFL-CIO v. Horizon Air. Indus. ("Horizon"), 976 F.2d 541 (9th Cir. 1992);

Indep. Fed'n of Flight Attendants v. Trans World Airlines, 682 F. Supp. 1003, 1020 (W.D. Mo.

1988); American Airlines, Inc. v. Air Line Pilots Ass'n, Int'l, 169 F. Supp. 777, 795 (S.D.N.Y.

1958).

       B.      Plaintiff's Claim of Failure to Bargain in Good Faith (Count IV) Does Not State a
               Claim Upon Which Relief Can be Granted

In Count IV, USAPA alleges that defendants have taken no good-faith steps to reach an

integrated CBA, and it seeks an injunction enjoining defendants from continuing their bad faith

bargaining.  Am. Compl. ¶¶ 182, 186.  Defendants' lack of good faith is allegedly evidenced by:

> (a) their general hostility towards and contempt for the negotiating process;
> (b) understaffing the negotiation personnel; (c) delaying and frustrating
> bargaining by refusing to agree to additional negotiating sessions; (d) refusing to
> respond to proposals made by plaintiff concerning contested major issues such as
> pay and vacation; (e) intentionally and continually [making] repeated
> unreasonable bargaining proposals while fully aware that said proposals would be
> rejected by plaintiff, and do not conform to existing industry standards; (f)
> unilaterally making changes to the grievance and arbitration processes despite
> [being] in negotiations; and (g) embarking on a campaign of harassment and
> intimidation of pilots for raising safety concerns . . . .

Am. Compl. ¶ 182.  As additional indicia of defendants' bad faith, plaintiff also points to defendants' purported failure to respond positively to plaintiff's bargaining proposals, their insistence on using private mediation before agreeing to NMB mediation, and Beth Holden's comment about "kill[ing] a bit of time" during a bargaining session.  DiOrio Decl. ¶¶ 37-40; Pl.'s Mem. at 43; DiOrio Supp. Decl. ¶¶ 4-9.

Defendants correctly argue that plaintiff's allegations fall short of alleging the requisite "desire not to reach an agreement."  Plaintiffs do not claim that defendants have engaged the sort of conduct that clearly evidences bad faith, such as refusing to meet with union representatives or to engage in NMB mediation.  See In re Nw. Airlines Corp., 483 F.3d at 176-77.   Indeed, plaintiff concedes that, since May 2010, defendants have sent several high-level representatives to monthly mediations sessions under the auspices of the NMB.  Courts have generally refrained from entertaining a claim brought pursuant to 45 U.S.C. §152 First where NMB mediation is ongoing.  See In re Nw. Airlines Corp., 483 F.3d at175 (determining that employer had not violated the RLA based, in part, on the fact that the NMB had not deemed further negotiations futile); Air Line Pilots Ass'n, Int'l v. Spirit Airlines, Inc. ("Spirit"), No. 08-CV-13785, 2009 U.S. Dist. LEXIS 52326, at *44 (E.D. Mich. June 18, 2009) (considering as relevant but not dispositive that NMB mediation was in progress and no impasse had been declared).  That defendants pursued private mediation before acceding to NMB-led mediation does not, as plaintiff claims, show bad faith on the part of defendants, particularly since the Transition Agreement gives each party the option to do so.

In its opposition to defendants' motion to dismiss, plaintiff argues that defendants' alleged conduct is capable of showing that defendants' participation in negotiations is mere pretense and that, in reality, defendants wish to continue with the current CBAs because of the

significant cost savings they provide defendants.  Pl's. Memo at 43-44.  In this regard, plaintiff

likens defendants' conduct to that engaged in by the air carrier Horizon and found to evince bad-

faith bargaining by the Ninth Circuit.  Horizon, 976 F.2d 541.  There,

> [t]he district court found Horizon "engaged in the mere pretense of negotiation"
> and adopted "evasive and dilatory tactics" that revealed an intent to "wait until the
> union acceded to its demands."  Specifically, the court found: 1) Horizon
> displayed a general attitude of hostility towards the collective bargaining process;
> 2) Horizon attempted to "frustrate the negotiations schedule" by "refusing to
> release flight attendants for negotiations and insisting on scheduling infrequent
> negotiating sessions"; 3) Horizon's negotiator made numerous derogatory
> statements . . . about the bargaining process during the negotiations"; 4) "Horizon
> sought to bargain directly with the flight attendants over mandatory subjects of
> bargaining" in violation of 45 U.S.C. § 152 Third, Fourth & Ninth; and 5)
> Horizon intentionally made contract proposals "which it knew were so
> consistently and predictably unpalatable to the [union] so as to show that Horizon
> intended that the parties not reach agreement."

Id. at 545-46.  The evidence supporting these findings included anti-union statements issued by

Horizon prior to the union's certification; evidence that Horizon cancelled several negotiation

sessions and refused to meet on Mondays, Tuesdays, Friday afternoons, or weekends; and

Horizon's submission of proposals less advantageous to its flight attendants than existing terms

and conditions and substantially less generous than prior proposals or provisions in a contract

with non-union pilots.  Id. at 546-47.  The Ninth Circuit held that, based on such evidence,

considered cumulatively, the district court's finding that Horizon had failed to exert every

reasonable effort to reach an agreement was not clearly erroneous.  Id. at 547.

Plaintiff's allegations fall far short of the level of egregious, bad-faith bargaining found to

have existed in Horizon.  In large part, plaintiff's claims are conclusory in nature and void of

factual content that would permit a conclusion that defendants engaged in the misconduct

alleged, as opposed to mere speculation that they did so.  See Iqbal, 129 S. Ct. at 1949;

Twombly, 550 U.S. at 555.  In particular, as discussed in more detail infra, plaintiffs' claims of

anti-union harassment are, for the most part, vague and unsupported.  Moreover, none of the instances of the purported anti-union activity cited by plaintiff, such as defendants' alleged discharge of pilots for their failure to finish required training and their change of the lanyard policy, come close to the sort of explicit anti-union behavior at issue in Horizon, where there was evidence that the carrier threatened to violate willfully any union contract in order to make the grievance process too expensive for the union to survive and refused to release flight attendants for negotiating sessions despite the union's offer to pay for their lost time.  Horizon, 976 F.2d at 546.  Nor could Beth Holdren's email, on its own, permit a finding that US Airways wished to avoid reaching agreement.  It stands in stark contrast to the "repeated[] disparag[ing of] the union's proposals, the collective bargaining process, and the individual union negotiators" made by Horizon's spokesman in negotiations and found relevant to the court's determination that Horizon was bargaining in bad faith.  Id.  Because plaintiff's allegations of broad anti-union bias are unsubstantiated by well-pleaded facts, they cannot give rise to the inference that defendants are negotiating in bad faith.  See Chicago & N. W. Ry. Co., 402 U.S. at 575 (stating that an employer's duty to bargain in good faith is essentially a corollary of its duty to recognize a union).

Plaintiff's other allegations—including that defendants have not significantly altered their proposals from the Kirby proposal—similarly fall short of stating a claim for bad faith bargaining.  Plaintiff misconceives the scope of the duty "to exert every reasonable effort" to reach an agreement, which does not require one side to accede to the other's proposals:

> [M]ovement toward the position of the other side is not a requirement of good faith bargaining. . . . Mere insistence on demands that seem extremely harsh to the other side and that a neutral party may consider "hard" is not a violation of bargaining duties.  An employer may insist on positions consistent with . . . its asserted needs, even if the union may consider the proposals greedy.

22

Trans World Airlines, Inc., 682 F. Supp. at 1026 (internal citations omitted).  "Courts must resist finding violations of the RLA based solely on evidence of hard bargaining, inability to reach agreement, or intransigent positions."  Horizon, 976 F.2d at 545.  Here, plaintiff essentially asks the court to find bad faith predicated on US Airways' lack of flexibility and its unwillingness to become more generous as the bargaining process progresses.  But a company's bargaining positions do not violate the statutory standards merely because they are "obstinate and unyielding," Trans Int'l Airlines, Inc. v. Int'l Bhd. of Teamsters, 650 F.2d 949, 958 (9th Cir. 1980) (internal quotation marks omitted), and the distance between the parties after a long period of negotiations does not amount to a lack of reasonable effort to reach an agreement, Spirit, 2009 U.S. Dist. LEXIS 52326, at *30.

Nor could the facts alleged by plaintiff otherwise permit a conclusion that defendants are engaged in the mere pretense of negotiation.  Extreme bargaining positions, such as a proposal by a carrier that would allow it to change unilaterally any work rule at any time for any reason or that would require the union to recruit replacement workers during a strike, have been found to constitute evidence of such surface bargaining.  See Horizon, 976 F.2d at 547.  Here, by contrast, USAPA argues that defendants' proposal is unreasonable because it does not conform to industry standards as USAPA defines them.  In order to assess this contention, the court would be forced to assess the substantive proposals of each party and to weigh their reasonableness.  Doing so would take the court beyond the permissible scope of a bad faith bargaining inquiry.  See Spirit, 2009 U.S. Dist. LEXIS 52326, at *43 ("The Court cannot, and will not, evaluate these substantive negotiation proposals or weigh their reasonableness." (citations omitted)); see Chicago & N. W. Ry. Co., 402 U.S. at 579 n.11 ("[G]reat circumspection should be used in going beyond cases involving 'desire not to reach an agreement,' for doing so risks infringement

of the strong federal labor policy against governmental interference with the substantive terms of collective-bargaining agreements.").  Because plaintiff does not allege facts sufficient to permit a conclusion that defendants have violated 45 U.S.C. § 152 First, the court dismisses plaintiff's complaint in this regard.[9]

### III.     The Court Lacks Subject Matter Jurisdiction Over Plaintiff's Remaining Claims

A.     Major v. Minor Disputes and the Court's Jurisdiction

The RLA was enacted to encourage collective bargaining in order to prevent wasteful strikes and interruptions to interstate commerce arising from major disputes and, to that end, has established "rather elaborate machinery for negotiation, mediation, voluntary arbitration, and conciliation" to assist parties in navigating such controversies.  Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union ("Shore Line"), 396 U.S. 142, 148-49 (1969).  Under the RLA, a dispute is characterized as either major or minor: "major disputes seek to create contractual rights, minor disputes to enforce them."  Consol. Rail Corp. v. Ry. Labor Executives' Ass'n ("Conrail"), 491 U.S. 299, 302 (1989).  The court's jurisdiction over a dispute hinges on whether it is properly classified as major or minor.  While federal courts have limited jurisdiction over major disputes, "[i]f a dispute is characterized as minor, a court cannot assert jurisdiction over the action nor can the parties seek judicial remedies such as an injunction."  Bhd. of Locomotive Eng'rs Div. 269 v. Long Island R.R., 85 F.3d 35, 37 (2d Cir. 1996).

"The statutory bases for the major dispute category are § 2 Seventh[10] and § 6[11] of the

---

[9] Plaintiff argues that defendants' bad faith is also evidenced by unilateral changes they have made to the grievance and dispute resolution procedures.  As discussed infra, these allegations involve minor disputes, they are not the sort of impermissible conduct that has been found to constitute evidence of bad faith bargaining.  See Int'l Ass'n of Machinists & Aerospace Workers v. Transportes Aereos Mercantiles Pan Americandos, S.A., 924 F.2d 1005, 1010 (11th Cir. 1991).

[10] "No carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title."  45 U.S.C. § 152 Seventh.

[11] "Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change

RLA." <u>Conrail</u>, 491 U.S. at 302 (citation omitted).  This category

> relates to disputes over the formation of collective agreements or efforts to secure them.  They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy.  They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.

<u>Id.</u> (quoting <u>Elgin, J. & E.R. Co. v. Burley</u>, 325 U.S. 711, 723 (1945) (internal quotation marks

omitted)).  In the event of a major dispute, the RLA requires that the parties engage in a lengthy

process of bargaining and mediation during which they are obligated to maintain the status quo.

The status quo is not defined merely by the working conditions governed by the parties' existing

agreements but "extends to those actual, objective working conditions out of which the dispute

arose." <u>Shore Line</u>, 396 U.S. at 153.

      "The district courts have subject-matter jurisdiction to enjoin a violation of the status quo

pending completion of the required procedures, without the customary showing of irreparable

injury." <u>Conrail</u>, 491 U.S. at 303; <u>see</u> <u>In re Nw. Airlines Corp.</u>, 483 F.3d 160, 167 (2d Cir.

2007).  However, the violations that the court enjoins must themselves constitute or stem from

the major dispute at issue, as the mere fact that a major dispute is occurring and has triggered the

obligation to maintain the status quo does not, without more, extend the court's jurisdiction to

unrelated minor disputes.  <u>Cf.</u> <u>Shore Line</u>, 396 U.S. 142 at 152-53 ("The obligation of both

parties during a period in which any of these status quo provisions is properly invoked is to

preserve and maintain unchanged those actual, objective working conditions and practices,

broadly conceived, which were in effect prior to the time the pending dispute arose <u>and which</u>

<u>are involved in or related to that dispute</u>." (emphasis added)); <u>CSX Transp., Inc. v. United</u>

---

in agreements affecting rates of pay, rules, or working conditions. . . . In every case where such notice of intended change has been given, . . . rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 155 of this title, by the Mediation Board, unless [certain conditions are met]." 45 U.S.C. § 156.

Transp. Union, 879 F.2d 990, 1000 (2d Cir. 1989) ("[A]ssuming that a minor dispute is in fact

presented, the service of Section 6 notices by the appellant unions would have no transforming or

alchemizing effect upon that situation."); see also Bhd. Ry. Carmen v. Missouri Pac. R.R. Co.,

944 F.2d 1422, 1428 (8th Cir. 1991).

"In contrast, the minor dispute category is predicated on § 2 Sixth[12] and § 3 First (i)[13] of

the RLA, which set forth conference and compulsory arbitration procedures for a dispute arising

or growing out of grievances or out of the interpretation or application of agreements concerning

rates of pay, rules, or working conditions." Conrail, 491 U.S. at 303 (internal quotation marks

omitted). This category

> contemplates the existence of a collective agreement already concluded or, at any
> rate, a situation in which no effort is made to bring about a formal change in terms
> or to create a new one. The dispute relates either to the meaning or proper
> application of a particular provision with reference to a specific situation or to an
> omitted case. In the latter event the claim is founded upon some incident of the
> employment relation, or asserted one, independent of those covered by the
> collective agreement, e.g., claims on account of personal injuries. In either case
> the claim is to rights accrued, not merely to have new ones created for the future.

Id. (quoting Burley, 325 U.S. at 723). "The distinguishing feature of such a case is that the

dispute may be conclusively resolved by interpreting the existing agreement." Id. at 305. Minor

disputes are subject to exclusive arbitral jurisdiction of a system adjustment board established by

the airlines and the unions, to which the courts must defer. Id. at 303-04 & n.4, 310.

To determine whether or not it has jurisdiction over a particular matter brought before it,

---

[12] "In case of a dispute between a carrier or carriers and its or their employees, arising out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, it shall be the duty of the designated representative or representatives of such carrier or carriers and of such employees, within ten days after the receipt of notice of a desire on the part of either party to confer in respect to such dispute, to specify a time and place at which such conference shall be held . . . ." 45 U.S.C. § 152 Sixth.

[13] "The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions . . . shall be handled in the usual manner . . . ; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes." 45 U.S.C. § 153 First (i).

a federal district court must, as a threshold matter, assess whether the dispute is major or minor. "Where an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective-bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major."[14] Id. at 307. The employer bears a "relatively light burden" in persuading the court that the action is arguably justified. See id. (citation and internal quotation marks omitted). In the Second Circuit, in order to meet the "arguably justified" test, "'an employer need demonstrate only that a reasonable trier of fact could adopt the employer's view of the contract.'" Long Island R.R., 85 F.3d at 38 (quoting Ass'n of Flight Attendants v. United Airlines, Inc., 976 F.2d 102, 105 (2d Cir. 1992)).

B.  Plaintiff's Claims Related to Pilot Grievances and Dispute Resolution Procedures (Counts II, III, and V)

In Counts II and III, plaintiff alleges that, since approximately the spring of 2007, defendants have failed to maintain the status quo during an on-going major dispute by abandoning well-established expedited dispute resolution procedures and intentionally frustrating the conduct of arbitration hearings.[15] Am. Compl. ¶¶ 150-70. According to USAPA, such abandonment constitutes a unilateral change in objective working conditions and has resulted in an abrogation of the grievance and arbitration process in its entirety. Id. ¶¶ 61, 167. As a remedy, plaintiff seeks declaratory and injunctive relief. Id. ¶¶ 157, 162, 168-69. In Count V,

---

[14] A court may determine that an employer's claim that an agreement gives him discretion to take a particular action is not "arguably justified" if that claim is made in bad faith. Id. at 310.

[15] Counts II and III are virtually identical. Count II alleges that defendants' duty to maintain the status quo stems from the parties' ongoing negotiations for a single integrated CBA, Am. Compl. ¶¶ 152-52, while Count III alleges that defendants' "unilateral abrogation of the grievance and arbitration process" itself constitutes a major dispute triggering the parties' obligation to maintain the status quo, id. ¶ 165. As a practical matter, the counts are functionally the same since, regardless of the genesis of the parties' obligation to maintain the status quo, the court lacks jurisdiction over any departures from the status quo that are arguably justified by the terms of the CBA. See Bhd. Ry. Carmen, 944 F.2d at 1428 ("[O]nce the court finds that an employer's actions are arguably justified under the terms of existing agreements, the status quo issue is 'mooted.'" (citation omitted)).

plaintiff reasserts a similar claim in a different guise by alleging that defendants have violated the RLA's obligations to "exert every reasonable effort to . . . settle all disputes . . . arising out of the application" of an existing CBA, 45 U.S.C. § 152 First, and to consider and decide all disputes between it and its employees "with all expedition" with the designated representatives of its employees, id. § 152 Second.  Am. Compl. ¶¶ 188-202.  It seeks declaratory relief ordering defendants to restore the grievance and arbitration process as previously practiced by the parties. Id. ¶ 195.  Because the parties' disagreements over grievance and dispute resolution procedures are minor, the court does not have jurisdiction over Counts II, III, and V of the complaint.

The parties' controversy over the scheduling and conduct of arbitrations and the use of alternative dispute resolution procedures is a minor dispute, insofar as it clearly "aris[es] or grow[s] 'out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions.'"[16] Conrail, 491 U.S. at 303.  Other courts to have considered disputes over the scheduling of arbitration hearings and the availability of alternative, expedited dispute processes have generally found them to be minor disputes, themselves subject to arbitration.  See Bhd. of Maint. of Way Emps. v. Union Pac. R.R. Co., 358 F.3d 453, 457 (7th Cir. 2004) (holding that parties' disagreement over the availability of expedited arbitration was a minor dispute); Thacker v. St. Louis Sw. Ry., 257 F.3d 922, 923-924 (8th Cir. 2001) (finding minor a dispute pertaining to the scheduling decisions for a disciplinary hearing).  Where, as here, the parties agree that the underlying grievances at issue are subject to arbitration and the arbitration process is still progressing, albeit not in the exact manner that one party may prefer,

---

[16] The court assumes, without deciding, that plaintiff's allegations relating to Counts II, III, and V are facially sufficient to establish the court's jurisdiction over them and state a plausible claim upon which relief may be granted.  Because the court agrees with defendants that the issues raised in Counts II, III, and V are minor disputes over which it does not have jurisdiction, the court does not assess whether plaintiff's claims themselves plead adequate jurisdictional facts and does not address defendants' arguments that these counts should also be dismissed pursuant to Rule 12(b)(6).

"[t]he specific facts regarding just how recalcitrant [the defendant company] has been do not affect whether this Court has jurisdiction." Air Line Pilots Ass'n, Int'l v. Champion Air, Inc., Civil File No. 06-2467, 2007 U.S. Dist. LEXIS 31067 at *12 (D. Minn. Apr. 27, 2007); see id. at *2-3, 7-12 (rejecting, as insufficient to establish subject matter jurisdiction, allegations that the defendant company had failed to engage in necessary steps to arbitrate any of the forty-eight grievances that had been brought over a five-year period). Similarly, whether the parties have, as required by the Transition Agreement, used "to the maximum extent possible, expedited dispute resolution processes" to resolve open grievances and disputes, is a minor dispute involving the interpretation of an established agreement between the parties. See Addington v. US Airline Pilots Ass'n, 588 F. Supp. 2d 1051, 1062-1064 (D. Ariz. 2008) (holding that claim that US Airways violated terms of the Transition Agreement at issue here were minor disputes because they involved the interpretation of CBAs).

Moreover, US Airways has undoubtedly met its light burden in persuading the court that it was arguably justified in the actions it took with regard to the parties' grievance and dispute resolution procedures. US Airways has adduced evidence showing that USAPA's allegation that US Airways is unilaterally hindering the efficient progress of arbitrations is inaccurate and exaggerated and indicating that, to the degree that US Airways' actions have produced some delay, USAPA has equally occasioned delay in the conduct and scheduling of arbitrations. With regard to USAPA's claim that US Airways has unilaterally refused to employ past practices to resolve grievances, US Airways has produced declarations providing details about the continued use of such practices and attesting that USAPA has not affirmatively pursued their use. US Airways has also provided details about the pilot behavior at issue that led the company to decline to offer LCAs in those cases and has provided evidence indicating that US Airways'

decisions were in line with its past practice of not offering LCAs or were otherwise arguably justified.  Finally, US Airways has enumerated several ways in which USAPA has failed to pursue efforts to reduce the backlog of pilot grievances.  In response, USAPA has provided only a few discrete examples of delay on the part of US Airways and reasserted its generalized allegations of defendants' unilateral abrogation and bad faith.

Plaintiff seeks to establish the court's jurisdiction by arguing that defendants' effective abrogation of the dispute resolution procedures, in the aggregate, constitutes a major dispute over which the court has jurisdiction.  In so arguing, plaintiff likens the instant situation to the facts presented in International Longshoremen's Association v. Toledo Lakefront Dock Company, No. C 77-635, 1977 U.S. Dist. LEXIS 12356 (N.D. Ohio Dec. 16, 1977).  That case is inapposite. There, the court found that the defendant company's "extreme position" that the CBA's provision governing dispute resolution was no longer an enforceable provision of the CBA constituted a major dispute.  See id. at *7-8.  Such a scenario presented a paradigmatic major dispute, where a party seeks to modify unilaterally the terms of a CBA.  See Conrail, 491 U.S. at 302 (stating that major disputes arise "where it is sought to change the terms of [a CBA]"). While USAPA alleges that US Airways' unilateral actions resulted in the functional equivalent of an abrogation of the agreed-upon dispute resolution procedures, it admits that such processes are still being utilized and has failed to make a showing of bad faith on US Airways' part. Indeed, as summarized supra, there is evidence that USAPA's own lack of diligence has had a significant role to play in the backlog of pilot grievances.  Moreover, the concrete figures that plaintiff has provided lend little support to its allegations of an exploding backlog of pilot grievances:  from April 2008, when plaintiff became a party to the CBAs, to July 2011, when plaintiff filed its amended complaint, the overall number of grievances grew by only twenty-

30

seven, from 483 to 510.  Such a small percentage of growth casts further doubt on plaintiff's portrayal of the backlog as a product of obstructive, unilateral action by defendant.  As USAPA has failed to establish that the dispute here is major by virtue of a de facto abolition of the parties' pilot grievance processing procedures, the court lacks subject matter jurisdiction to entertain its claims related to these claims.[17]

That plaintiff purports to bring a statutory claim in Count V does not change this result. As defendants correctly note, courts generally apply the major-minor analysis in evaluating whether they have jurisdiction over such statutory claims.  See, e.g., Union Pac. R.R. Co., 358 F.3d 453, 457 (affirming dismissal for lack of subject matter jurisdiction the union's claim that the company had violated 45 U.S.C. §152 First by not submitting to expedited arbitration, based on a determination that the claim involved a minor dispute).  Plaintiff's unsupported assertion that the System Board of Adjustment does not have jurisdiction over the claim because it is statutory, as opposed to contractual, is not a solid basis on which this court's jurisdiction may be predicated.

C.      Alleged Violations of 45 U.S.C. § 152 Third and Fourth (Count I)[18]

In its remaining claim, Count I, USAPA alleges that US Airways has violated the RLA's prohibition on interfering with the right of employees to choose their representatives and join a union.  The RLA provides, in relevant part, that an employer shall not "interfere with, influence, or coerce" its employees in their choice of representatives, 45 U.S.C. § 152 Third, and that "[e]mployees shall have the right to organize and bargain collectively through representatives of

---

[17] For the reasons stated in defendants' briefing, the other violations of the status quo alleged by plaintiff are also minor disputes over which the court does not have jurisdiction.  See Defs.' Mem. of Law in Support of Mot. to Dismiss (Dkt. No. 25), at 41-42.
[18] Plaintiff captions Count I as also asserting an alleged violation of 45 U.S.C. § 152 First.  Plaintiff's citation to that section appears to have been a typographical error, as the section pertains to the duty of carriers and employees to settle disputes and plaintiff makes no argument for its application to representative rights.

their own choosing, id. § 152 Fourth.  Because defendants' purported breach of the RLA's

collective bargaining guarantees involves only minor disputes and plaintiff does not establish

that judicial intervention is otherwise merited, the court lacks jurisdiction over Count I.

> Plaintiff alleges that defendants' violations of the RLA are evidenced by defendants'
>
> (a) repudiating the collective bargaining process by failing to exert every reasonable effort to bargain over an integrated contract and in the administration of the contract by abandoning long established dispute resolution procedures; (b) threatening USAPA representatives with termination for engaging in speech and other lawful activities to improve working conditions and safety; (c) requiring pilots to submit to investigatory interviews over operational judgments . . ., (d) adopting policies restricting pilots' right to wear and display union-associated insignia . . ., (e) terminating pilots for reasons that are unprecedented . . . and; (f) abrogating and rendering ineffectual the grievance an arbitration process . . . .

Am Compl. ¶ 148.  As defendants correctly assert, these alleged incidences of interference with

the collective bargaining rights of USAPA and its members are minor disputes over which the

court does not have jurisdiction.  Plaintiff's claims that defendants improperly threatened to

discipline pilots, conducted investigatory interviews of pilots, and improperly discharged pilots

involve disciplinary issues that are properly presented to the System Board of Adjustment.  See

United Transp. Union v. Nat'l R.R. Passenger Corp., 588 F.3d 805, 810 (2d Cir. 2009) ("We

have specifically held that the category of 'minor disputes' encompasses 'disciplinary disputes

even if involving employee discharge.'" (quoting Indep. Union of Flight Attend. v. Pan

American World Airways ("Pan Am"), 789 F.2d 139, 141 (2d Cir. 1986)).  Similarly, plaintiff's

allegation that defendant's lanyard policy violated its representational and collective bargaining

rights is a minor dispute over which this court does not have jurisdiction.  See Ass'n of Flight

Attendants, AFL-CIO v. Horizon Air Indus., 280 F.3d 901 (9th Cir. 2002) (affirming dismissal

for lack of subject matter jurisdiction a claim asserting that employees had a statutory right,

pursuant to 45 U.S.C. § 152, to wear a union pin while on duty).  The court has already

concluded that plaintiff's objections to the grievance and arbitration process similarly raise only minor disputes.

Plaintiff argues that the court's exercise of jurisdiction is nonetheless proper in this case because it constitutes one of the exceptional situations where federal jurisdiction may be exercised over a dispute developing after union certification that concerns existing rights. Generally, post-certification disputes are subject to the exclusive jurisdiction of an adjustment board.  Pan Am, 789 F.2d at 141; see Trans World Airlines, Inc. v. Indep. Fed'n of Flight Attendants, 489 U.S. 426, 440 (1989) (observing that the Supreme Court has consistently viewed 45 U.S.C. § 152 Third and Fourth as "addressing primarily the precertification rights and freedoms of unorganized employees").  However, "[r]unning through Congress' exacting allocation of administrative jurisdiction is a thread of judicial intervention in cases in which, but for the general jurisdiction of the federal courts there would be no remedy to enforce the statutory commands which Congress had written into the Railway Labor Act." Pan Am, 789 F.2d at 141 (citation and internal quotation marks omitted); see Trans World Airlines, Inc., 489 U.S. at 441 (same).  Such a case is presented, and federal judicial intervention may thus be warranted, "only where it is clear that the employer's conduct has been motivated by anti-union animus or an attempt to interfere with its employees' choice of their collective bargaining representative, or constitutes discrimination or coercion against that representative, or involves acts of intimidation which cannot be remedied by administrative means." Pan Am, 789 F.2d at 142 (internal quotation marks, citations, and alterations omitted).

Plaintiff asserts that this court may properly exercise jurisdiction over this post-certification dispute because plaintiff has alleged anti-union animus on the part of defendants. Pl.'s Mem. at 29.  USAPA argues that US Airway's animus is evidenced by (1) its failure to

33

exert every effort to bargain in good faith to reach a single integrated CBA, (2) its abandonment of contractual and long established grievance and arbitration procedures, and (3) its retaliation against and discipline of USAPA pilots.  Pl.'s Mem. at 25-26.  As discussed supra, plaintiff has failed to plead facts that could permit a finding that defendants have bargained in bad faith. Moreover, plaintiff does not expalin how the purported failure by defendants to bargain in good faith could demonstrate anti-union animus on defendant's part, other than claiming that such is the case.  A collection of minor disputes, over which the court does not have jurisdiction, make up the remainder of the purported indicia offered by plaintiff to show defendants' anti-union animus.  Plaintiff cannot bring such minor disputes within the court's jurisdiction simply by bundling them up and adding a bare assertion of anti-union animus.  Cf. Int'l Ass'n of Machinists v. Eastern Airlines, Inc., 320 F.2d 451, 454 (5th Cir. 1963) ("Plaintiff has made no 'direct positive' charge of any independent underlying purpose on the part of the employer to thwart the effectiveness of collective bargaining agents. . . . The Adjustment Board cannot be by-passed; its jurisdiction cannot be thwarted in minor disputes in grievance cases by the bald allegation that the violations of the agreement are 'but a part of a deliberate scheme' designed to eliminate the union as sole bargaining agent.").  Without supportive factual allegations capable of demonstrating that an employer was motivated by anti-union animus, "conclusory claims of anti-union animus do not establish subject-matter jurisdiction."[19]  Int'l Ass'n of Machinists & Aerospace Workers v. Eastern Air Lines, Inc., 847 F.2d 1014, 1017 (2d Cir. 1988).  Plaintiff's alternative argument that the exercise of federal jurisdiction here is proper because "the System

---

[19] The cases cited by plaintiff in support of its contention that it is improper to dismiss a claim of anti-union animus at the early stage of litigation without factual discovery are inapposite, insofar as the plaintiffs in those cases pled facts sufficient to permit a finding of anti-union animus, which is not the case here.  Pl.'s Mem. at 29; see, e.g., Virgin Atl. Airways, Ltd. V. Nat'l Mediation Bd., 956 F.3d 1245, 1252-53 (2d Cir. 1992) (finding allegations that carrier discharged employees engaged in striking to enforce NMB certification and solicited employees to sign a prepared statement repudiating the union adequate to state a claim for violation of 45 U.S.C. § 152 Third and Fourth).

Board of Adjustment would provide no remedy given defendants' conduct in [rendering] the grievance and arbitration process entirely ineffectual as a means of resolving disputes," Pl.'s Memo. At 28, fails for similar reasons. The court has determined that it does not have jurisdiction over plaintiff's claims pertaining to the parties' grievance and dispute resolution procedures. Simply reiterating the same argument in another context does not somehow endow the court with jurisdiction over the minor disputes that plaintiff brings before it. Because the claims raised in Count I are within the exclusive jurisdiction of the System Board of Adjustment, the court dismisses them pursuant to Rule 12(b)(1).

## CONCLUSION

Defendants' motion to dismiss is granted in full. Counts I, II, III, and V are dismissed with prejudice pursuant to Rule 12(b)(1).[20]  Count IV is dismissed without prejudice pursuant to Rule 12(b)(6). Given the allegations of plaintiff and the facts attested to by the parties in litigating this motion, the court is doubtful that plaintiff could cure this count through amendment. However, should plaintiff seek to do so, plaintiff's counsel shall file a letter, pursuant to the court's individual motion practices, requesting leave to amend and outlining in detail the additional facts it could allege in support of its claim. Failure to do so within thirty days will result in the dismissal of Count I with prejudice, the entry of judgment, and the closing of the docket in this case.

SO ORDERED.

_____

[20] The parties have made an evidentiary showing on these counts that demonstrate that plaintiff cannot cure its complaint to establish subject matter jurisdiction. Leave to amend would therefore be futile, and the court dismisses these counts with prejudice. See 5B Charles Alan Wright et al., Federal Practice & Procedure § 1350 (3d Ed. 2011) ("Only when the affidavits show that the pleader cannot truthfully amend to allege subject matter jurisdiction should the court dismiss without leave to replead."); see also Pot Luck, L.L.C. v. Freeman, No. 06-Civ. 10195, 2009 U.S. Dist. LEXIS 25097 (S.D.N.Y. Mar. 10, 2009) ("[A] court may dismiss without leave to amend when amendment would be futile.").

Allyne R. Ross
United States District Judge

Dated:      March 15, 2012
              Brooklyn, New York